**PRAEFKE AUTO ELECTRIC & BATTERY CO., INC. d/b/a Praefke Aircooled Engines, Plaintiff,**

v.

**TECUMSEH PRODUCTS CO., Defendant.**

No. 99–C–0830.

United States District Court,
E.D. Wisconsin.

July 18, 2000.

James Snodgrass, Brookfield, WI, Irving Zerbel, Scottsdale, AZ, for Plaintiff.

James W. Mohr, Jr., Hartford, WI, Larry J. Saylor, Detroit, MI, for Defendant.

## DECISION AND ORDER

ADELMAN, District Judge.

Plaintiff Praefke Auto Electric & Battery Co., Inc., d/b/a Praefke Aircooled Engines ("Praefke") seeks remedies against Tecumseh Products Co. ("Tecumseh") for Praefke's termination as a Tecumseh Authorized Service Dealer in March 1999, allegedly in violation of the Wisconsin Fair Dealership Law, Wis.Stats. ch. 135 ("the WFDL"). This court has diversity jurisdiction; Tecumseh is incorporated in Michigan and Michigan is its principal place of business, while Praefke is incorporated in Wisconsin and Wisconsin is its principal place of business. Presently before me is Praefke's motion for a temporary injunction. The issue has been fully briefed and the parties also presented oral arguments.

## I. FACTUAL BACKGROUND

Praefke distributes and services engines and related products, and has serviced and distributed Tecumseh engines and products for the past forty years.

Prior to the events giving rise to this litigation, Tecumseh relied on a three-tier distribution system to distribute and sell its engines as follows:

First Tier (CWDs): Central Warehouse Distributors (bought directly from Tecumseh; sold to ASDs)

Second Tier (ASDs): Authorized Service Distributors (bought from CWDs; sold to RSDs)

Third Tier (RSDs): Registered Service Dealers (bought from ASDs; sold to end users)

(R. Schmidt Aff. ¶ 4; Def.'s App. in Supp. of Def.'s Br. in Opp'n to Pl's Mot. for Temporary Inj. [hereinafter Def.'s App.] Melius Decl. ¶¶ 3, 4, 7). Praefke was a second-tier Authorized Service Distributor ("ASD"). (R. Schmidt Aff. ¶ 5.) (Praefke

also sold Tecumseh products directly to the public as a Registered Service Dealer ("RSD") (Def.'s App.Exs. 3, 4) but its status as an RSD is not at issue in this litigation (Pl's Mem. in Supp. of Mot. for Temporary Inj. at 6 n. 3); Praefke's sales of Tecumseh products to end users accounted for approximately 3% of its Tecumseh sales (Def.'s App.R. Schmidt Dep. at 21).)

Tecumseh suggested but did not enforce discounts among its tiers of distributors. (Def.'s App. Melius Decl. ¶ 9; Schlamp Aff. ¶ 26.) Praefke's CWD was H.R.R. Zimmerman Co., d/b/a Industrial Engine & Parts ("Industrial"). Praefke purchased Tecumseh products from Industrial at a 56.5% discount from Tecumseh's recommended retail price, and sold them to the third-tier distributors, the RSDs, at a 40% discount. (Schlamp Aff. ¶ 3.) This provided Praefke with a 37.9% markup from cost.[1] Both the 56.5% and 40% discount levels followed Tecumseh's recommendations. (Def.'s App. Melius Decl. ¶ 9.) Praefke had approximately 110 RSDs in its distribution network. (Schlamp Aff. ¶ 33.)

## A. Contract Between Tecumseh and Industrial

The current contract appointing Industrial as a Tecumseh first-tier CWD distributor was signed in 1988. Under this contract, Industrial could appoint ASDs only with Tecumseh approval. (Pl.'s Exs. in Supp. of Pl.'s Mot. for Temporary Inj.Ex. 9 ¶¶ (b–4), (b–11) [hereinafter Pl.'s Ex.].) Thus, Tecumseh had the power to prevent Industrial from appointing Praefke as an ASD.[2] Industrial also could not enter any other kind of agreement with an ASD until Tecumseh approved. (Id. ¶ b–11.)

The Tecumseh–Industrial contract had no expiration date, but could be terminated

---

1. Praefke bought at a 56.5% discount from retail, and sold to its RSDs at a 40% discount from retail. This is equivalent to a cost of 43.5% of retail and a sale price of 60% of retail, a 37.9% markup from cost.

2. Tecumseh denies ever exercising this veto power. (Def.'s App. Melius Decl. ¶ 8.)

on 10 days' notice for cause, or on 30 days' notice without cause. (*Id.* ¶¶ (d–1, d–2).) If Tecumseh terminated Industrial, all ASDs appointed by Industrial would be automatically terminated. (*Id.* ¶ (c–11).) Tecumseh could thus cause Praefke to be automatically terminated, simply by terminating Industrial.[3] Importantly, the Tecumseh–Industrial contract specified that Industrial was not an agent of Tecumseh and had no authority to transact business in Tecumseh's name. (Pl.'s Ex. 9 ¶ (c–1).)

## B. Contract Between Industrial and Praefke

Before the WFDL was enacted in 1973, Tecumseh's ASDs were appointed through three-party contracts; both Tecumseh and the relevant CWD were parties to these contracts. From the 1950s onwards, Praefke was appointed as a Tecumseh ASD through such three-party contracts. (L. Schmidt Aff. ¶ 9.)[4] At some time after passage of the WFDL, Tecumseh drafted ASD appointment contracts which asserted that they were two-party contracts. (R. Schmidt Aff. ¶ 19.) Tecumseh required its CWDs to use these Tecumseh-drafted contracts to appoint their ASDs. (Pl.'s Ex. 9 ¶ (b–11).)

The current Industrial–Praefke contract, signed in 1987, follows this pattern:

> This Agreement is between Applicant [Praefke] and Central Warehouse Distributor. It is agreed by all parties that

neither Tecumseh Products Company nor Lauson–Power Products Parts Depot [a Tecumseh division] is a party to this agreement, except that the appointment of Applicant as an Authorized Service Distributor must be approved by Lauson–Power Parts Depot indicating approval thereof hereon.

(Def.'s App.Ex. 1 at 2.)

The contract between Industrial and Praefke was written on a form bearing Tecumseh's corporate logo. (Def.'s App. Ex. 1.) Tecumseh's approval and signature were required before Praefke's appointment as an ASD became effective. (*Id.* at 2.)[5] Likewise, Praefke could appoint third-tier RSDs solely on forms provided by Tecumseh, and it could appoint them and enter other agreements with them only if Tecumseh approved. (*Id.* at 2 § o.) Moreover, under the Tecumseh-drafted contracts that Praefke was required to use to appoint RSDs—contracts purportedly solely between Praefke and its RSDs—Tecumseh retained the right to determine that the RSD had breached its contract with Praefke and could seek remedies for such breaches. (Def.'s App.Ex. 3 at 2 ¶ 5.) In addition, under the Industrial–Praefke contract, Praefke was required to terminate any RSDs at Tecumseh's request. (Def.'s App.Ex. 1 at 2 § s.)[6] Further, Tecumseh reserved the right to sell Tecumseh

---

**3.** The Tecumseh–Industrial contract required Tecumseh to give Industrial 30 days' notice that it was terminating Industrial. However, possibly in violation of the WFDL's notice provisions, none of the contracts involved provided for either Tecumseh or Industrial to give affected ASDs any notice that they were about to be automatically terminated by virtue of Tecumseh's terminating Industrial.

**4.** Tecumseh raises various evidentiary objections to copies that Praefke has provided in this litigation of three-party contracts between Tecumseh, Wisconsin Magneto, Inc. as CWD, and a different ASD, Marshfield Auto Electric Service, Inc., dating from the 1960s and 1970s. (Pl.'s Ex. 5.) Nonetheless, Praefke may rely upon the affidavit of its president,

Loyd Schmidt, who testified from his personal knowledge as an officer and director from the 1950s to the present that Praefke entered into three-party contracts with Tecumseh and its CWDs.

**5.** Tecumseh asserts that its representative's signature "merely acknowledged [Industrial's] appointment of Praefke." (Def.'s App. Melius Decl. ¶ 12.) The contract belies this claim, because it states that Tecumseh approval was required for the contract to have legal effect. Tecumseh's signature was thus more than merely an acknowledgment that Industrial had taken certain action.

**6.** Tecumseh asserts that, in practice, it did not use this authority.

goods to RSDs in Praefke's territory. (*Id.* at 2.)

Praefke promised to use its best efforts to promote and sell Tecumseh products; to maintain an adequate stock of Tecumseh goods; to recruit, appoint, and assist a network of RSDs; to advertise the Tecumseh product line; and to conduct schools for RSDs on Tecumseh products and service. (*Id.*)

Under the contract, Tecumseh made several commitments. It foreswore any right to recover damages from either Praefke or Industrial if Praefke resigned or was terminated as a Tecumseh ASD. (*Id.*) Secondly, Tecumseh released Praefke from its obligations under prior contracts with Tecumseh. (*Id.*)

The contract was to run for a one-year period to end June 1, 1988, or upon 30 days' written notice from either Industrial or Praefke. (*Id.*) If the Tecumseh–Industrial contract was terminated for any reason, Praefke's contract with Industrial would automatically terminate, and so would Praefke's contracts with all RSDs that it had appointed. (*Id.*)

The contract assigned Praefke an "Area of primary responsibility (Territory)" comprising Milwaukee and Waukesha Counties plus a 100–mile radius. (*Id.* at 1.) Industrial and Tecumseh both reserved the right to sell Tecumseh goods in Praefke's territory. (*Id.*)

**C. Facts Leading to Current Suit**

On February 23, 1999, Tecumseh notified Industrial that it was terminating its contract with Industrial, effective March 25, 1999. (Def.'s App.Ex. 9.) Under the 1987 Industrial–Praefke contract, this had the effect of automatically terminating

Praefke as a Tecumseh ASD, presumably as of the effective date of Industrial's termination, March 25. (Def.'s App.Ex. 1 at 2.) Tecumseh appointed a new CWD, Central Power Distributors, Inc. ("Central Power"). (Schlamp Aff. ¶ 30.) All parties assumed that Central Power would simply step into Industrial's shoes and become Praefke's new CWD. However, Central Power decided that rather than using Tecumseh's historic three-tier distribution model for all territories in its region, it would directly distribute Tecumseh goods to the third-tier RSDs in the territories previously served by the better ASDs. (*Id.* ¶ 31.)

As a consequence, Central Power informed Praefke at a March 24, 1999 meeting that it was being terminated as an ASD, and that Central Power had already begun conducting business directly with Praefke's sales network of 110 Tecumseh RSDs. (*Id.* ¶¶ 31, 33.) [7] Praefke received no notification or advance warning that it was about to be terminated. (*Id.* ¶ 35.) Central Power's only concession was that it would consider using Praefke as an RSD in the network that Praefke had previously built and serviced. (*Id.* ¶ 34.)

Central Power stated that Praefke's termination had nothing to do with its performance. (*Id.* ¶ 32.) Indeed, Central Power considered Praefke to be one of Industrial's better ASDs (*id.* ¶ 31) and "the best of the best" (R. Schmidt Aff. ¶ 18). Central Power explained the termination as "an economic decision made by Central Power and accepted by Tecumseh, which allowed Central Power to make more money by taking over the territories and underlying 'Service Organizations' of Tecumseh's better Authorized Service Distributors."

---

**7.** As stated above, Tecumseh had already caused Praefke to be "automatically terminated" as an ASD as of March 25, simply by terminating Industrial as of that date. Nonetheless, Central Power's declaration that it was deciding which ASDs to take over and which would remain (Schlamp Aff. ¶ 31) indicates that it regarded itself as stepping into Industrial's shoes. Central Power jumped the gun by informing Praefke that it was terminated on March 24. However, it would seem that at most one day's worth of damages flows from this jumping of the gun, as Praefke was terminated the following day by operation of the contract's automatic termination clause.

(Schlamp Aff. ¶ 31.)[8] Central Power's strategy was to take over the territories of some but not all of the ASDs. (*Id.*) A week later, Central Power later sent Tecumseh a fax identifying Praefke as a "cancelled" ASD. (Pl.'s Ex. 3.)

Following these events, Praefke has attempted to purchase goods from both Central Power and Tecumseh. Tecumseh has refused to fill Praefke's orders at all, and Central Power fills the orders only if Praefke pays the higher prices that Tecumseh sets for bottom-tier RSDs. (*Id.* ¶ 37.) At oral argument, Praefke indicated that it succumbed, in order to maintain its relations with its previous RSDs; it purchases Tecumseh goods from Central Power at the 40% RSD discount, and resells them to its former RSD network at cost, that is, with zero markup, rather than its former 37.9% markup. Praefke contends that its termination as an ASD, without cause and without notice, violated the WFDL. Additional information will be provided in the course of the discussion.

## II. STANDARD OF DECISION

 Praefke has moved for a temporary injunction as authorized under Wis. Stat. § 135.065. A party seeking preliminary injunctive relief must show: (1) a reasonable likelihood of success on the merits, (2) no adequate remedy at law, and (3) irreparable harm if injunctive relief is denied. *See Graham v. Medical Mut.*, 130 F.3d 293, 295 (7th Cir.1997). In the context of the WFDL, the second and third steps frequently merge together; "[t]o say that the injury is irreparable means that the methods of repair (remedies at law) are inadequate." *Fleet Wholesale Supply Co. v. Remington Arms Co.*, 846 F.2d 1095,

1098 (7th Cir.1988). If the petitioner satisfies the initial three-step burden, the court must balance the irreparable harm to the nonmoving party if the injunction is granted against the irreparable harm to the moving party if the injunction is denied. *See Graham*, 130 F.3d at 295. Finally, the court must consider the effect of the injunction on nonparties, that is, its effect on the public interest. *See id.*

## III. CHOICE OF LAW

As a district judge sitting in diversity, I must apply the substantive law that would be applied by the state in which I sit, here, Wisconsin. *See Erie Ry. Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). This in turn requires determining which state's law the Wisconsin courts would apply. Wisconsin recognizes that parties to a contract may expressly agree that the law of a jurisdiction other than that of the domicile or place of signing shall control. *See Jefferis v. Kanawha*, 182 Wis. 203, 205, 196 N.W. 238 (1923). In this case, the Industrial–Praefke contract indicates that it is to be construed under the laws of Michigan and to be deemed to have been agreed to in Michigan, as does the 1988 contract between Industrial and Praefke. (Def.'s App.Ex. 1 at 2; Pl.'s Ex. 9 ¶ (c–8).) If Michigan law applies, then Praefke might be entitled only to whatever dealer protections are provided by Michigan law, rather than the protections of the WFDL.

 Despite the general principle that parties may adopt choice of law provisions, Wisconsin holds that they may not do so at the expense of important public policies of a state whose law would apply in the absence of such an agreement. *See*

**8.** Tecumseh asserts that Central Power made this decision unilaterally and without input from Tecumseh. (Def.'s App. Melius Decl. ¶ 19.) But this assertion does not contradict Praefke's claim that Tecumseh approved of the decision. If the Central Power–Tecumseh contract paralleled the Tecumseh–Industrial contract (and Tecumseh has not provided a copy indicating otherwise), Central Power is required to select and appoint ASDs in its region, and Tecumseh may terminate Central Power with 10 days' notice for failing to do so. (Pl.'s Ex. 9 ¶¶ (b–4), (d–1(ii)).) Tecumseh's taking no action after learning that Central Power had unilaterally decided not to select or appoint ASDs in its region certainly can be construed as Tecumseh approval.

*Bush v. National Sch. Studios, Inc.,* 139 Wis.2d 635, 642, 407 N.W.2d 883 (1987). The WFDL reflects a "compelling interest" of the state of Wisconsin, Wis.Stat. § 135 .025(2)(a), and therefore overrides parties' choice of law provisions in cases where Wisconsin law would otherwise apply. *See Bush,* 139 Wis.2d at 644–45, 407 N.W.2d 883.

■ I therefore must determine whether Wisconsin law would apply here in the absence of the parties' choice of law provisions. In contract cases, Wisconsin applies the local law of the state with which the contract has its most significant relationship. *See Handal v. American Farmers Mut. Cas. Co.,* 79 Wis.2d 67, 73, 255 N.W.2d 903 (1977). In this case, Industrial is located in Illinois, but the Industrial–Praefke contract governed the distribution, sale, and servicing of goods within Wisconsin. In addition, Praefke is a Wisconsin corporation domiciled and doing business in Wisconsin. *See Peterson v. Warren,* 31 Wis.2d 547, 558, 143 N.W.2d 560 (1966), *overruled on other grounds by Allen v. Ross,* 38 Wis.2d 209, 215, 156 N.W.2d 434 (1968). Wisconsin therefore appears to have the most significant relationship with the contract. I will thus apply Wisconsin's substantive laws, including the WFDL, if they are otherwise applicable.

## IV. LIKELIHOOD OF PREVAILING UNDER THE WFDL

Praefke must establish that it is a "dealer" under the WFDL and that Tecumseh is a "grantor" of its dealership. *See* Wis. Stat. § 135.02. The alleged dealership must be situated in Wisconsin, and (as relevant here) there must be (1) a contract or agreement between two or more persons; (2) granting Praefke the right to sell or distribute goods, or to use commercial symbols; (3) in which there is a "community of interest" in the business of selling or distributing goods. *Id.* §§ 135.02(2), (3)(a). If these criteria are satisfied, Tecumseh could terminate, cancel, or substan-

tially change the competitive circumstances of Praefke's dealership only with good cause. *See id.* § 135.03.

■ The parties do not dispute that if there was a dealership, it was "situated in Wisconsin." Wis.Stat. § 135.02(2). It is the location of the dealership—that is, where the business done and subject matter of the contract occur—and not the location of the dealer that matters. *See Baldewein Co. v. Tri–Clover, Inc.,* 233 Wis.2d 57, 76, 606 N.W.2d 145 (2000). In this case, Praefke not only was located in Wisconsin, but distributed, sold, and serviced Tecumseh products. in Wisconsin. The dealership, if any, was thus situated in Wisconsin. Further, Tecumseh acknowledges that Praefke had the right to sell and distribute goods, as well as to use its commercial symbols.

■ In addition, there is no serious dispute that there was not good cause; the grantor bears the burden of proving good cause, *see* Wis.Stat. § 135.03, and where (as here) no problems with the dealer's conduct are alleged, the grantor must prove that it was demonstrably losing substantial amounts of money under the relationship, and moreover that the changes in the terms on which it conducted business with its dealers were essential, reasonable and nondiscriminatory. *See Ziegler Co. v. Rexnord, Inc.,* 147 Wis.2d 308, 316, 433 N.W.2d 8 (1988) [hereinafter *Ziegler II*], *modifying on other grounds on reh'g* 139 Wis.2d 593, 407 N.W.2d 873 (1987) [hereinafter *Ziegler I*]. Tecumseh has not asserted, much less shown, that it was losing money in its relation with Praefke, or that Praefke's being terminated as an ASD was a proportionate response to an objectively ascertainable need for change. *See Morley–Murphy Co. v. Zenith Elecs. Corp.,* 142 F.3d 373, 378 (7th Cir.1998).

Application of the WFDL therefore boils down to three contested issues: Was Tecumseh a party to a contract or agreement (which granted Praefke the right to sell and distribute goods or use commercial

symbols); was there a community of interest between Praefke and Tecumseh; and was Praefke terminated, cancelled, or subjected to substantial change in its competitive circumstances?

## A. Contract or Agreement, Express or Implied

The WFDL requires "a contract or agreement, either express or implied, whether oral or written." Wis.Stat. § 135.02(2). I discuss in turn the Tecumseh–Industrial contract and the Preafke–Industrial contract.

### 1. Tecumseh–Industrial Contract

■ Tecumseh obviously was a party to the Tecumseh–Industrial contract. This contract authorized Industrial to appoint ASDs, such as Praefke, and to make them part of Tecumseh's distribution network. However, the mere fact that the Tecumseh–Industrial contract contemplated that Industrial would appoint ASDs does not make Tecumseh a grantor of a Praefke dealership. This portion of the fact pattern is identical to that in *Bong v. Cerny*, 158 Wis.2d 474, 463 N.W.2d 359 (Ct.App. 1990). In that case, a manufacturer and a distributor signed a contract under which the manufacturer authorized the first-tier distributor to appoint second-tier sub-distributors or "jobbers." Two jobbers sued the manufacturer, on the theory that they were third-party beneficiaries of the express contract between the manufacturer and the distributor. The court held that the contract merely authorized the distributor to appoint jobbers, and did not vest any right in the plaintiff jobbers to be appointed. *See id.* at 480, 463 N.W.2d 359. In other words, the express contract between the manufacturer and the distributor did not grant a dealership to anyone.

### 2. Industrial–Praefke Contract

#### a. Duration

■ By its terms, the Industrial–Praefke contract expired on June 1, 1988, after a one-year term. The contract provided a renewal mechanism that Praefke, Industrial and Tecumseh all ignored; they simply continued their relations after the contract's expiration date. I therefore must determine whether the contract remained in force after its expiration date.

The Seventh Circuit addressed precisely this issue in the context of the WFDL in *Reinders Brothers v. Rain Bird Eastern Sales Corp.*, 627 F.2d 44 (7th Cir.1980). The manufacturer there, Rain Bird, entered a series of annually-expiring contracts with the asserted dealer, Reinders Brothers. Rain Bird did not sign a renewal contract for the 1978 calendar year, but continued to do business with Reinders Brothers as before. The Seventh Circuit found that because the manufacturer continued to deal with the asserted dealer as a distributor throughout 1978 and attempted to terminate the asserted dealer in 1979, "[t]hese factors point *unequivocally* to a renewal of the agreement between the parties at the outset of 1978." *Id.* at 50 (emphasis added). Importantly, one reason for this holding was that the WFDL, by its terms, is to be construed liberally and applied to promote its underlying remedial purposes. *See* Wis.Stat. § 135.025(1). The court found that this policy would be violated if a manufacturer could evade the WFDL by entering an annually-expiring contract with a dealer, allowing it to expire but continuing to do business on the same terms with its dealer, and then asserting that the parties had no "contract" or "agreement" under the WFDL, but merely an informal arrangement. *See Reinders Bros.*, 627 F.2d at 50.

The Wisconsin courts similarly hold that where parties continue their relations after a contract's term has expired, the contract is considered to have been renewed for another term of the same length. *See Brown v. Oneida Knitting Mills*, 226 Wis. 662, 277 N.W. 653, 657 (1938); *Appleton Waterworks Co. v. City of Appleton*, 132 Wis. 563, 113 N.W. 44, 48 (1907).

In the present case, it is undisputed that Praefke, Industrial and Tecumseh continued their previous relations after July 1, 1988 in the same way as before. Because none of them did anything to overcome the presumption arising from their conduct that they intended to renew the contract, the contract was renewed each year, and remained in force through at least March 25, 1999.

### b. Was Tecumseh a Grantor by Virtue of the Industrial–Praefke Contract?

■ The WFDL defines a grantor simply as "a person who grants a dealership." Wis.Stat. § 135.02(5). Courts have not construed this provision except in the context of whether grantors' successors should be considered grantors. Thus the question presented is whether a manufacturer, as well as a first-tier distributor, can be a grantor of a second-tier distributor's dealership. Nothing in the WFDL indicates that there can be only one grantor of a dealership; the mere fact that Industrial likely was a grantor of Praefke's dealership, if any, does not bar a finding that Tecumseh was also a grantor of a dealership.

A dealership is granted by means of a contract or agreement, either express or implied. *See id.* § 135.02(3)(a). Thus whether Tecumseh was a grantor turns upon whether it was a party to the contract or agreement between Industrial and Praefke. A party is "[o]ne who takes part in a transaction." *Black's Law Dictionary* 1144 (7th ed.1999). A person mentioned in a contract is a party, rather than a beneficiary, if it has obligations under the contract. *See Super 7 Motel Assocs. v. Wang,* 16 Cal.App.4th 541, 20 Cal.Rptr.2d 193, 196–97 (1993). I must therefore determine whether Tecumseh took part in the contract between Industrial and Praefke and whether it had any obligations under the contract.

■ The contract was written on a form bearing Tecumseh's corporate logo. Tecumseh's approval and signature were required for Praefke to become a Tecumseh ASD. Praefke could appoint third-tier RSDs solely on Tecumseh-provided forms. Praefke could appoint RSDs, and enter other agreements with them, only if Tecumseh approved. Tecumseh could determine that an RSD had breached its contract with Praefke and could seek remedies for such breaches. Praefke was required to terminate any RSDs at Tecumseh's request. Tecumseh reserved the right to sell Tecumseh goods to RSDs in Praefke's territory. Praefke promised to use its best efforts to promote and sell Tecumseh products; to maintain an adequate stock of Tecumseh goods; to recruit, appoint, and assist a network of RSDs; to advertise the Tecumseh product line; and to conduct schools for RSDs on Tecumseh products and service.

Tecumseh could cause Praefke's contract with Industrial to be automatically terminated, as well as Praefke's contracts with all RSDs that it appointed, simply by terminating Industrial as a CWD.

Tecumseh foreswore any right to recover damages from either Praefke or Industrial if Praefke resigned or was terminated as a Tecumseh ASD. Tecumseh also released Praefke from its obligations under prior contracts with Tecumseh. Tecumseh cannot claim that those commitments arose through Industrial's acting on its behalf, because the Tecumseh–Industrial contract was explicit that Industrial was not an agent of Tecumseh's and could not enter any transactions on Tecumseh's behalf. Thus, only Tecumseh could have made these commitments.

It is clear from the foregoing that Tecumseh played a major part in the transaction appointing Praefke as a Tecumseh ASD. Tecumseh drafted the form of the contract and dictated all of its provisions. Obligations under the contract flowed both directly from Praefke to Tecumseh and directly from Tecumseh to Praefke.

Therefore if a dealership was created, Tecumseh played a major part in granting it.[9]

### c. Validity of the "Not a Party" Clause

As previously indicated, the Tecumseh-drafted contract between Industrial and Praefke included a clause expressly stating that Tecumseh was not a party to the contract. I refer to this as the "not a party" clause. The WFDL provides that clauses in dealership agreements that would vary the effect of the WFDL are void and unenforceable. *See* Wis.Stat. § 135.025(3). I therefore must determine whether the "not a party" clause varies the effect of the WFDL, and is thus void and unenforceable. Neither party briefed this issue.[10]

The WFDL seeks to protect dealers against unfair treatment by grantors, "who inherently have superior economic power and superior bargaining power in the negotiation of dealerships." Wis.Stat. § 135.025(2)(b). The WFDL is to be liberally construed and applied, to promote its underlying remedial purposes and policies. *See id.* § 135.025(1). Thus, the effect of the WFDL "may not be varied by contract or agreement." *See id.* § 135.025(3). Because grantors generally

draft dealership contracts and have superior economic and bargaining power, "[j]udicial protection of the terms of the agreement, rather than the individual dealer, or his business, systematically elevates the rights of the grantor over those of the dealer. We find that this outcome runs contrary to the explicit purpose of the WFDL." *Jungbluth v. Hometown, Inc.,* 201 Wis.2d 320, 330, 548 N.W.2d 519 (1996).

In this case, Tecumseh drafted language that it required Industrial to use to appoint Praefke as an ASD. As discussed above, but for the "not a party" language, Tecumseh itself was a party to the contract, because it assumed obligations and made commitments under the contract. Therefore, but for the "not a party" clause, Tecumseh is a grantor. To allow a grantor to a dealership to draft language declaring itself a non-party, and therefore immunize itself from its responsibilities under the WFDL, would clearly violate the policy of the WFDL.[11]

Accordingly, I find that the "not a party"clause would allow Tecumseh, as the drafter and a grantor, to escape the intent of the legislature in passing the WFDL. Pursuant to Wis.Stat. § 135.025(3), I

9. This case differs from the unpublished decision *Scott & Fetzer Co., Kirby Co. Div. v. Patel,* No. 86–C–29–C, 1987 WL 110400 (W.D.Wis. 1987), where Judge Crabb approved a magistrate judge's recommendation that a manufacturer was not a grantor of a second-tier distributor's dealership. In that case, unlike here, the manufacturer did not sign a contract appointing the distributor; the contract did not expressly reserve rights to the manufacturer; it did not require the distributor to gain the manufacturer's permission before carrying out tasks essential to the distributor's duties; and it did not include commitments from the manufacturer to the distributor.

10. Tecumseh might at least have cited *Implement Service, Inc. v. Tecumseh Products Co.,* 726 F.Supp. 1171, 1182 (S.D.Ind.1989), which held that by virtue of identical "not a party" language in the ASD appointment contract there, Tecumseh was not a franchisor under the Indiana Deceptive Franchise Practices Act, Ind.Code Ann. § 23–2–2.7–1. How-

ever, *Implement Service* is not applicable, because so far as the decision indicates, there, unlike here, Tecumseh did not make commitments or assume obligations towards the ASD. *Implement Service* should be further distinguished because the Indiana Deceptive Franchise Practices Act does not declare void and unenforceable contract clauses that vary its effect.

11. Similarly, a court applying the Automobile Dealers' Day in Court Act, 15 U.S.C. § 1222, which grants "distributors" certain protections from "manufacturers," observed that it would undermine that Act's purpose if a manufacturer could insulate itself from liability simply by setting up a network of first-tier distributors and requiring them, pursuant to the terms of their own agreements, to impose wrongful demands upon second-tier distributors. *See Empire Volkswagen, Inc. v. World-Wide Volkswagen Corp.,* 627 F.Supp. 1202, 1209 (S.D.N.Y.1986).

therefore find the clause void and unenforceable. For that reason, I find that Tecumseh is a grantor.

### d. Effect of Praefke and Tecumseh's Conduct

In determining whether there is a dealership under the WFDL, I am required not only to examine "the language of the written agreement," but also "the manner in which the parties operated." *Ziegler I*, 139 Wis.2d at 609 n. 11, 407 N.W.2d 873. *See also* Bowen & Butler, *The Wisconsin Fair Dealership Law* § 4.6 at 4–9 (observing that those protected by the statute can be determined only by "look[ing] at the parties' entire relationship; one may miss them if one looks only at the parties' contract").

It is clear from the foregoing discussion that Tecumseh is a grantor from the contract alone. The parties' conduct reinforces this conclusion. Tecumseh included Praefke in the annual directory of Tecumseh dealers that it prepared, printed, and distributed (Def.'s App. Melius Decl. ¶ 15); issued and mailed directly to Praefke certificates appointing Praefke as a Tecumseh ASD; placed Yellow Pages advertisements listing Praefke as an ASD, for which it charged Praefke half the cost; helped Praefke train RSDs about Tecumseh products; and assigned warranty numbers to Praefke's RSDs which were derived from Praefke's own warranty number, 53112.

### B. Community of Interest

■ To find the WFDL applicable, I must not only find that there was a contract or agreement and that Tecumseh was a grantor, but also that there is a "community of interest" between Tecumseh and Praefke. Wis.Stat. § 135.02(3)(a). This requires a "continuing financial interest between the grantor and grantee in either the operation of the dealership business or the marketing of such goods and services." *Id.* § 135.02(1). *Ziegler I*, 139 Wis.2d at 604–05, 407 N.W.2d 873, sets out two guideposts: There must be a continuing

financial interest between the grantor and grantee; and there must be interdependence. Interdependence is present if the grantor and grantee cooperate, coordinate activities, and share common goals. *See id.*

Under *Ziegler I*, courts are to examine at least ten specific factors to assess whether the guideposts are satisfied. *See id.* at 606, 407 N.W.2d 873. In making this assessment, the courts must look not just at the contract or agreement, but at the parties' "actual dealing" as well. *Id.* Moreover, not all factors must be present. *See Moodie v. School Book Fairs, Inc.*, 889 F.2d 739, 744 (7th Cir.1989). I find that four factors tilt towards Praefke; the others appear to be toss-ups. They are numbered in the sequence given in *Ziegler I*.

### 1. Factors Favoring Praefke

■ (1) Duration of relationship: Praefke has been distributing Tecumseh goods for forty years. Tecumseh appears to suggest that no period of the relationship before 1974, when the WFDL was first enacted, should be considered, but the Seventh Circuit has indicated otherwise. *See Morley–Murphy*, 142 F.3d at 374 (referring to parties' 58–year relationship).

(2) Extent and nature of the obligations imposed by the parties' contract or agreement. Praefke exercised its best efforts on Tecumseh's behalf, promised to and did place advertisements for Tecumseh goods, promised to and did provide training for Tecumseh RSDs, and established a distribution network for Tecumseh that Central Power described as "the best of the best."

Pursuant to a Tecumseh "50/50 co-op" offer, Tecumseh and Praefke cooperated in placing Yellow Pages listings that featured the Tecumseh commercial symbol and listed Praefke as a Tecumseh ASD. (Def.'s App. Melius Decl. ¶ 16; Pl.'s Exs. 2, 10.) Industrial was not mentioned in these ads. (Pl.'s Ex. 2.) Tecumseh billed Praefke for half the cost of the ads, or about $800 per year. (Schlamp Dep. 13).

Praefke arranged Tecumseh training "schools" several times each year. (Pl.'s Ex. 12.) It issued invitations jointly in its and Tecumseh's name and with both companies' logos, kept sign-in sheets showing which RSDs attended, and provided speakers. (Pl.'s Ex. 12; R. Schmidt Dep. 58–59.) Tecumseh provided factory representatives and additional speakers for these training sessions and paid for training handouts. (*Id.* 93.) Praefke generally paid $500 to $1,000 to rent the room and pay for coffee and doughnuts. (*Id.*) Between 75% and 90% of Praefke's 100–plus RSDs typically attended Praefke's Tecumseh training sessions. (*Id.* 94.) [12]

Tecumseh issued annual Certificates of Appointment stating that Praefke was appointed as an ASD, and sent them directly to Praefke. (Zimmerman Aff. ¶ 15; Def.'s App. Melius Decl. ¶ 12.) The most recent Certificate of Appointment stated that it expired May 31, 1999. (Def.'s App.Ex. 6 at 2.) Industrial did not issue any such certificates. (Zimmerman Aff. ¶ 16.) [13]

Tecumseh prepared, printed, and distributed nationally a thousand directories every year identifying Praefke as a Tecumseh ASD. (Def.'s App. Melius Decl. ¶ 15.) Over several years, Tecumseh also sponsored American Speed Association promotions, which included a dinner package, meeting race-car driver Bobby Allison, VIP tickets, autograph sessions, and Tecumseh racing products. (Schlamp Dep. 21.) Praefke was expected to "go out and sell to the [RSD] dealers, as a VIP day, [to] come to the Tecumseh race." (*Id.*) Over 1997 and 1998, Praefke paid some $2,000 to $3,000 for its RSDs to attend these Tecumseh races. (*Id.* at 22.)

From these factors, Tecumseh and Praefke's "actual dealing" indicates a network of extensive obligations, coordinated activities, cooperation, and shared goals.

(5) Extent and nature of the grantor's grant of territory to the grantee: Praefke was granted a territory comprising two heavily populated counties, Milwaukee and Waukesha, and an additional 100–mile radius. To be sure, Praefke's territory was non-exclusive; nonetheless, there is no evidence that Tecumseh or Industrial sold goods within Praefke's territory, or that either attempted to appoint another ASD in Praefke's territory. In addition, Praefke is the only ASD that Tecumseh listed in its Yellow Pages listings for the communities that Praefke served. Praefke's territory was thus large, and appears in practice to have been exclusive.

(6) Extent and nature of the grantee's uses of the grantor's commercial symbols: Praefke prominently displays Tecumseh's corporate logo on signs in its shop. (Schlamp Aff. ¶ 22.) Gauging from photographs submitted with Praefke's briefs, a large (perhaps 2' × 3') Tecumseh sign appears to be the only advertisement on the customer side of Praefke's service counter; and Praefke displays an illuminated Tecumseh sign of similar dimensions in its front window. (Pl.'s Ex. 11; R. Schmidt Dep. at 62.) Praefke also has several Tecumseh-logo stools by its service counter. (R. Schmidt Dep. at 66.) In addition, Praefke devotes wall space inside its store for a large display rack (perhaps 4' high × 3.5' wide) that holds Tecumseh brochures and training pamphlets for Tecumseh RSDs and customers. (Schlamp Aff. ¶ 24;

**12.** Tecumseh emphasizes that participation in its $^{5}\%_{0}$ Yellow Pages co-op program, as well as in Tecumseh-cosponsored dealer trainings, was voluntary, rather than mandatory. (Def.'s App. Melius Decl. ¶ 16.) Nonetheless, the Industrial–Praefke contract required Praefke to arrange for Yellow Pages listings and other advertisements, and required Praefke to provide dealer schools. (Def.'s App.Ex. 1 at 2.) Further, as stated above, *Ziegler I* requires examining "the actual deal-

ing of the parties," as well as their contract or agreement. *Ziegler I,* 139 Wis.2d at 606, 407 N.W.2d 873.

**13.** Tecumseh asserts that it issued these certificates only at Industrial's request (Def.'s Br. in Opp'n to Pl.'s Mot. for Temporary Inj. at 9 [hereinafter Def.'s Br. in Opp'n] ), but the affidavit Tecumseh cites does not support this claim.

Pl.'s Ex. 13.) Praefke also used Tecumseh's commercial symbols on the pamphlets, brochures, and training materials that it provided to RSDs, including the invitations that it prepared for the Tecumseh training schools that it paid for.

### 2. Factors That Appear to Be Toss–Ups

(3) Percentage of time or revenue the grantee devotes to the grantor's products or services, and (8) Personnel devoted to the alleged dealership by the grantee: Praefke did not assign any employees to work full-time on Tecumseh goods; each of its approximately thirteen employees apparently works on several manufacturers' lines. Nonetheless, they spend an amount of time devoted to Tecumseh's products in rough proportion to the amount of sales those products generate.

(4) Percentage of the grantee's gross proceeds or profits that the grantee derives from the grantor's products or services: Praefke's sales of Tecumseh goods over the past three years averaged more than $343,000, comprising approximately 13.5% of its income, and approximately 16% of its gross profits. (D. Schlamp Aff. ¶ 39.) By contrast, Praefke's sales of Poulan products accounted for a little over $1 million, or about 33% of total sales, and sales of Ferris products accounted for about $750,000, or a bit less than 25% of total sales. (Def.'s App.R. Schmidt Dep. at 20.) Praefke's sales of Tecumseh products yielded nearly $100,000 of its net profit per year over the past three years, approximately 16% of Praefke's net profit. (D. Schlamp Aff. ¶ 39.) Ninety-seven percent of such sales are made in its capacity as a Tecumseh ASD. (Def.'s App.R. Schmidt Dep. at 21).

The Wisconsin Supreme Court appeared to suggest in *Foerster, Inc. v. Atlas Metal Parts Co.*, 105 Wis.2d 17, 27, 313 N.W.2d 60 (1981), that a distributor must devote 50% to 60% of its business time to the sale of one company's products to qualify as a dealer under the WFDL. However, the court expressly repudiated this suggestion in *Ziegler I. See* 139 Wis.2d at 601–02, 407 N.W.2d 873. Rather, the shared financial interest must be such that termination would have a "significant economic impact on the alleged dealer," *id.* at 605, 407 N.W.2d 873, but this is not to be determined strictly through a percentage test, *see id.* at 602, 407 N.W.2d 873. In *Ziegler I* itself, a distributor derived between 1% and 8% of its total revenue from the alleged grantor, and the court remanded for further consideration of whether there was a community of interest. *See id.* at 607, 407 N.W.2d 873. Tecumseh emphasizes that Praefke sells some twenty-five sublines, but this ignores the fact that Praefke's Tecumseh sales are its third-largest. (R. Schmidt Dep. at 12.) A distributor's deriving even as little as 4% of its revenues from sales of the defendant's goods can establish a dealership if other characteristics of a community of interest are present. *See Reinders,* 627 F.2d at 47; *see also Frieburg Farm Equip., Inc. v. Van Dale, Inc.,* 978 F.2d 395, 400 (7th Cir.1992) (applying WFDL to plaintiff with 11% of total sales from defendant's products); *Kealey Pharmacy & Home Care Servs., Inc. v. Walgreen Co.,* 761 F.2d 345 (7th Cir.1985) (plaintiffs with between 6 and 13%). Thus, although Praefke's deriving 13.5% of its revenues and 16% of its profits from the sale of Tecumseh goods is not enough on its own to establish a continuing financial interest, neither is it so little to count as tilting in Tecumseh's favor.

(7) Extent and nature of the grantee's financial investment in the inventory, facilities, or goodwill of the alleged dealership: When Praefke was terminated in March 1999, it held an inventory of Tecumseh goods worth more than $260,000 (at retail), and worth between $150,000 and $170,000 (at cost). (Schlamp Aff. ¶ 26; R. Schmidt Dep. at 27.) However, Praefke has been able to continue selling its Tecumseh goods to the RSDs it served as ASD. (R. Schmidt Dep. at 26.) Moreover, Central

Power offered to purchase from Praefke excess inventory of Tecumseh parts that Praefke wished to sell. (Def.'a App.Ex. 7.) [14] For that reason, Praefke's inventory of Tecumseh goods is not a sunk cost or illiquid investment. *See Moore v. Tandy Corp.*, 819 F.2d 820, 822–23 (7th Cir.1987) (finding no dealership where alleged dealer's financial investment was limited to fully refundable security deposit; there was no sunk investment in fixtures, inventory, counters or decor). Several Seventh Circuit cases have declared that the requirement is satisfied only by sizeable investments that are specialized in some way to the grantor's goods or services, and hence are not fully recoverable upon termination. *See Frieburg*, 978 F.2d at 399; *Moodie*, 889 F.2d at 742 (alleged . dealer must show firm-specific investment in such items as training, specialized products, or goodwill). *See also Guderjohn v. Loewen-America, Inc.*, 179 Wis.2d 201, 210, 507 N.W.2d 115 (Ct.App.1993) (finding minimal or no financial investment where no evidence that alleged dealer could not sell whatever manufacturer's inventory it owned at termination, and alleged dealer had spent nothing on physical facilities or equipment). Thus, because Praefke's investment in Tecumseh inventory, although admittedly large, was relatively liquid, this factor may initially tip in Tecumseh's favor.

Even so, the Wisconsin Supreme Court has been explicit that a financial investment may be established via goodwill, as well as by inventory or specialized facilities. *See Ziegler I*, 139 Wis.2d at 606, 407 N.W.2d 873. Although a substantial investment is one way to satisfy the community of interest, it is not the only way. *See id.* at 608 n. 10, 407 N.W.2d 873 (citing *Bush*, 139 Wis.2d at 655, 407 N.W.2d 883). Praefke devoted years of effort to building its network of Tecumseh RSDs, and developed so much goodwill that Tecumseh's

newly-chosen CWD, Central Power, acknowledged Praefke as "the best of the best," and apparently concluded that Praefke's success made it worthwhile to poach its network of RSDs. Several of Praefke's RSDs purchase only Tecumseh goods from Praefke. To preserve its relation with these RSDs, as well as the rest of its network, Praefke purchased Tecumseh goods from Central Power after it was terminated at only an RSD discount, and then re-sold them to its RSDs at cost— rather than at its former 37.9% markup from cost—simply to maintain its RSD network. I believe that Praefke's valuation of its goodwill in its distribution network, implicit in its making these transactions, is enough to make this factor a toss-up.

(9) Extent of the grantee's expenditures on advertising or promotion for the grantor's products or services: Praefke paid some $2,000 to $3,000 for its RSDs to attend Tecumseh races; paid $500 to $1000 once or twice a year for dealer trainings; paid Tecumseh approximately $800 per year for Yellow Pages advertisements; and paid minimal amounts for the Tecumseh-logo signs and stools at its store. (R. Schmidt Dep. at 62–65.) Tecumseh contends that such payments were not only small, but also discretionary, and therefore did not contribute to a community of interest under *Cabinetree of Wisconsin, Inc. v. Kraftmaid Cabinetry, Inc.*, 914 F.Supp. 296, 301 (E.D.Wis.1996). To the contrary, though, as stated above, the Tecumseh-drafted contract between Praekfe and Industrial required Praefke to advertise, arrange for Yellow Pages advertisements, and conduct dealer schools. Thus, although these activities were not financially large, they do indicate a level of interdependence, coordination of activities, and cooperation between Tecumseh and Praefke. I thus find that this factor is a toss-up.

**14.** Praefke apparently does not have any specialized facilities required by its position as a

Tecumseh ASD.

(10) Extent and nature of any supplementary services provided by the grantee to consumers of the grantor's products or services: From the inception of the parties' relationship, Praefke performed warranty and service work for Tecumseh. (Schlamp Aff. ¶ 18.) Praefke directly billed Tecumseh for this work, and was paid directly by Tecumseh. (*Id.* ¶ 19.) If Praefke had not provided such services, it would cut against finding a dealership. *See Fleet Wholesale*, 846 F.2d at 1098. However, the parties have not identified the extent of this work, or indicated whether Praefke's customers for warranty work are primarily RSDs and end users, or whether instead most of this work is done for Tecumseh pursuant to the side-contract. I will therefore consider this factor a toss-up.

My review of the totality of the business relationship between Praefke and Tecumseh, as evidenced in their actual dealing and in their contract or agreement, *see Ziegler I*, 139 Wis.2d at 605–06, 407 N.W.2d 873, indicates that four factors tilt towards a community of interest, and that none decisively tilt against it. I therefore find it likely that Praefke will be able to establish that there is a community of interest.

## C. Insubstantial Change in Competitive Circumstances Rather Than Cancellation or Termination

 Because I have found a contract or agreement, granted in part by Tecumseh, and a community of interest, Praefke is entitled to the protections of the WFDL. The protection at issue here is the WFDL's prohibition on grantors' terminating, cancelling, failing to renew, or substantially changing the competitive circumstances of a dealership agreement without good cause. *See* Wis.Stat. § 135.03. I therefore must determine whether Tecumseh's conduct falls into any of these categories. Tecumseh contends that Praefke was simply converted from an ASD into an RSD, and that this works only a non-

substantial change in competitive circumstances.

Under both the Tecumseh–Industrial contract and the Tecumseh-drafted contract between Industrial and Praefke, Praefke was "automatically terminated" as an ASD when Tecumseh terminated Industrial. Central Power told Praefke that it was "terminated," and later sent Tecumseh a fax stating that Praefke was among the ASDs that it had "cancelled." It is uncontested that Praefke's former duties as an ASD—centrally among them, developing, appointing and training a network of 110 Tecumseh RSDs—were terminated. Ninety-seven percent of Praefke's sales of Tecumseh goods were in its capacity as an ASD. Central Power has refused to treat Praefke as an ASD and has given it only Tecumseh's recommended RSD discount. Praefke's former territory as an ASD was much larger than its territory as an RSD. The assertion that the termination of Praefke's ASD contract did not work a substantial change in the competitive circumstances of its dealership agreement blinks at reality. It is thus clear that Praefke's ASD dealership agreement was cancelled. Wis.Stat. § 135.03. Moreover, Tecumseh caused Praefke to be terminated as an ASD through its action of terminating Industrial, and it then took no action when Central Power terminated the most profitable ASDs in its territory in order to appropriate their RSD networks.

As stated above, Tecumseh contends that Praefke simply underwent a non-substantial change in the competitive circumstances of its dealership agreement, from being both an ASD and an RSD to being just an RSD. Moreover, Tecumseh observes, Praefke is still responsible for promoting and distributing Tecumseh products as an RSD.

An initial problem with this argument is that Praefke had not one but two agreements: the contract with Industrial by which it became an ASD, and the contract

by which it became an RSD.[15] As described above, Praefke had considerably broader responsibilities under the ASD contract than under the RSD contract. Praefke's happening to have the second contract does not convert the cancellation of the first contract into a non-substantial change in the first contract's competitive circumstances.

Second, whether a change in a dealership agreement leads to a substantial change in competitive circumstances is determined by comparing how the change affects the dealer compared to similarly situated dealers. The WFDL not only prohibits grantors from terminating dealership agreements outright, but also forbids them from driving a dealer out of business by raising the wholesale price to him only, so that he cannot complete against other dealers in the same product. *See Remus v. Amoco Oil Co.,* 794 F.2d 1238, 1240 (7th Cir.1986). This is precisely what was attempted here; with Tecumseh's approval, Central Power forced the most profitable Tecumseh ASDs to become RSDs only and effectively raised their wholesale prices by nearly 40%.

Tecumseh relies upon *East Bay Running Store, Inc. v. NIKE, Inc.,* 890 F.2d 996, 1000–01 (7th Cir.1989). In that case, Nike unilaterally imposed upon its dealers a new distribution strategy for its most profitable shoe brand, and as a result, a Wisconsin dealer lost much of its former profits. The court held that this was only a non-substantial change in competitive circumstances. Tecumseh contends that because Praefke's injuries are solely due to its now obtaining only the lower RSD discount, *East Bay* demonstrates that it has suffered no more than a non-substantial change in competitive circumstances.

To the contrary, *East Bay* undermines Tecumseh's position. First, *East Bay* explicitly relies upon Nike's applying its change evenhandedly to all dealers nation-wide. *See East Bay,* 890 F.2d at 1000–01. By contrast, Tecumseh has not even asserted that it replaced any other CWD using Tecumseh's traditional three-tier distribution system with a CWD using only two tiers. Moreover, Tecumseh's assertion that Praefke was terminated pursuant to a "state-wide change in Tecumseh's distribution strategy" (Def.'s Br. in Opp'n at 20) is mistaken. The change in distribution strategy was not "state-wide," but was limited solely to the better ASDs in Central Power's territory. (Schlamp Aff. ¶ 31.) The asserted change in distribution strategy was thus neither systemwide nor imposed evenhandedly.

In addition, *East Bay* is explicit that, under the WFDL, a grantor may not assert a "change in distribution strategy" in a ploy to appropriate the good will that dealers established in marketing the grantor's products in the region. *See East Bay,* 890 F.2d at 1000–01. This appears to be precisely Central Power's business plan, adopted with Tecumseh approval: in order to make more money, Central Power appropriated the RSD networks of the better ASDs in its territory. Far from blessing such predatory behavior under the guise of a "state-wide change in Tecumseh's distribution strategy," *East Bay* condemns it.

In sum, Praefke has shown that it is likely to establish that Tecumseh was a grantor of its contract with Industrial; that the contract and Praefke and Tecumseh's dealings with one another formed a community of interest; and that Praefke's ASD dealership was terminated without good cause. Praefke has thus shown that it is likely to prevail on the merits in this action.

## V. REMAINING PRELIMINARY INJUNCTION CRITERIA

As previously stated, the criteria for a preliminary injunction are (1) a reasonable

---

15. Praefke itself, in its capacity as an ASD, was the immediate grantor of its RSD dealer-ship. (Def.'s App.Ex. 4.)

likelihood of success on the merits; (2) no adequate remedy at law; (3) irreparable harm if injunctive relief is denied; (4) a balance of irreparable harms in the moving party's favor; and (5) that the public interest will not be harmed. I have just concluded that Praefke is likely to prevail on the merits. I here address the remaining criteria.

 (2) and (3) No adequate remedy at law, and irreparable harm if injunctive relief is denied: Praefke faces the loss of forty years' effort in developing and maintaining a distribution network for Tecumseh. It has been trying to retain its RSD network by buying Tecumseh goods and reselling them at cost—losing its former markup of nearly 40% of cost—but cannot sustain the financial burden of doing so. In addition, Central Power, even before announcing that it was terminating Praefke, began contacting Praefke's RSDs in order to take over Praefke's distribution network. (Schlamp Aff. ¶ 31.) Thus, even if Praefke had access to indefinite credit to finance buying Tecumseh goods at only the RSD discount, rather than the ASD discount, it would still face continuous diminution of its RSD base, due to Central Power's Tecumseh-approved encroachment upon Praefke's RSDs. The continued viability of Praefke's distribution network thus could not be repaired merely by an award of monetary damages at the end of litigation.

Evidence of a WFDL violation is prima facie evidence of irreparable harm. See Wis.Stat. § 135.065. Irreparable harm is confirmed where a dealer faces diminution of a customer base built up over many years. In Reinders, the Seventh Circuit affirmed the district court's finding that the plaintiff "would suffer an irreparable loss of the good will accumulated with its customers during its 20 years as a Rain Bird dealer." 627 F.2d at 53. Even though the plaintiff was still able to purchase Rain Bird products, albeit at a higher price, the court found that interruption of a direct supply would clearly interfere with the plaintiff's efficient servicing of its clientele. See id.

Tecumseh relies upon Fleet Wholesale and Price Engineering Co. v. Vickers, Inc., 774 F.Supp. 1160 (E.D.Wis.1991). In the first case, the Seventh Circuit held that there was no irreparable harm where the grantor increased its alleged dealer's price by 5% and its products represented 0.5% of the alleged dealer's total sales. See Fleet Wholesale, 846 F.2d at 1097. "The weakness on the merits, combined with the fact that the case entails only a 5% price increase on 0.5% of Fleet's business, suggests that the potential costs of an erroneous denial of interim relief are small." Id. Similarly, in Price Engineering, the court found that the plaintiff was unlikely to establish that it was a dealership (the defendant's line of fluid power products was one of 70 brands that the plaintiff sold), and found that the only harm that the plaintiff faced was a loss of business. See Price Eng'g, 774 F.Supp. at 1161–62.

By contrast, as discussed at length above, Praefke is likely to prevail upon the merits in this case. In addition, Praefke faces more than merely the loss of profits and business on its third-largest of four or five manufacturers' lines, but the disintegration of its hard-won distribution network, established and maintained for forty years, due both to the unsustainable cost of selling to RSDs at its own costs, and also to Central Power's actively attempting to take over Praefke's RSDs not only with Tecumseh's tacit approval but also with the benefit of a substantial discount on Tecumseh goods denied to Praefke. This represents a substantial loss of goodwill. Injury to goodwill can constitute irreparable harm that is not compensable by an award of money damages. See Gateway E. Ry. Co. v. Terminal R.R. Ass'n, 35 F.3d 1134, 1140 (7th Cir.1994). For these reasons, I believe that Tecumseh has not dislodged the statutory presumption that irreparable harm would result if an injunction were denied.

(4) Balancing of irreparable harms: Tecumseh contends that if it is ordered to direct Central Power to adopt Praefke as a Tecumseh ASD, it would become vulnerable to price-fixing claims. A manufacturer may suggest resale prices, but it violates the Sherman Act's prohibitions on restraint of trade, 15 U.S.C. § 1, if it fixes its customers' resale prices. *See California Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc.*, 445 U.S. 97, 103, 100 S.Ct. 937, 63 L.Ed.2d 233 (1980); *see also* Wis. Stat. § 133.03(1) (similarly forbidding restraints in trade). Tecumseh observes that Praefke must pay security in the event that the injunction proves to have been wrongly issued, *see* Fed.R.Civ.P. 65(c), and suggests that Praefke could not afford to indemnify Tecumseh for such serious violations of federal and state law. I believe that Tecumseh's fears are overstated. Tecumseh already recommends retail prices and particular discount levels to its CWDs, ASDs, and RSDs. Tecumseh cites no authority for its claim that it would violate the Sherman Act or corresponding state antitrust law if it (1) caused Praefke to be re-appointed as a Tecumseh ASD on the same terms as other Tecumseh ASDs, and (2) continued its standing recommendation that ASDs receive a 56.5% discount from the recommended retail price.

Tecumseh will be exposed to negligible potential injury, because business will be conducted as it was prior to the termination, and thus sales of its product will continue in Praefke's territory. *See Lakefield Tel. Co. v. Northern Telecom, Inc.*, 656 F.Supp. 813, 819 (E.D.Wis.1987).

(5) Public interest considerations: Tecumseh contends that the public interest will be harmed if an injunction is granted, because the public interest is not served by antitrust violations. As discussed above, such concerns are not implicated where Praefke's desired relief is simply a restoration to the former status quo. To the contrary, the public interest is best served by protecting dealers from predatory behavior of the kind asserted here. Tecumseh also contends that the relevant former status quo was not Praefke's being an ASD, but Praefke's being a non-ASD and Central Power's appropriating its territory and distribution network of RSDs. But by statute, the WFDL allows temporary injunctions to be granted for WFDL violations. *See* Wis.Stat. § 135.065. Such violations by definition involve the termination, cancellation, failure to renew, or substantial change of dealership agreements. *See id.* § 135.03. Tecumseh may not profit by causing Praefke to be terminated without cause and without notice, and then asserting that Praefke cannot receive preliminary relief because the status quo changed before it could bring suit.

## VI. REMEDY

For the reasons discussed above, Praefke has established that it is entitled to preliminary relief. It requests to be restored to its former status as an ASD. Tecumseh contends that it cannot appoint Praefke as an ASD because it contractually gave that power to Central Power, and moreover contends that Central Power has abandoned Tecumseh's former three-tier distribution system and no longer uses ASDs.

As discussed above, Central Power appears to have appropriated the territory only of those ASDs that it considered most successful, and in addition it appears that Tecumseh accepted these actions without complaint. Moreover, Tecumseh issued Praekfe a certificate stating that Praefke was appointed as a Tecumseh ASD through May 1999, and then—through the operation of contract clauses that it had drafted—caused Praefke to be terminated automatically and without notice months early when Tecumseh terminated Industrial. Tecumseh is thus in a weak position to protest that it is a victim of its drafting. Nonetheless, before fashioning the precise language of the injunction, further discussion with the parties may be useful. There will therefore be a telephone confer-

ence on Monday, July 31, 2000 at 3 p.m., Central Daylight Time. The court will initiate the call. Tecumseh is directed to file and serve a copy of the Central Power–Tecumseh contract by July 25, 2000.

**NOW, THEREFORE, IT IS HEREBY ORDERED** that Praefke's motion for temporary injunction (R. 9) is **GRANTED,** and that there will be a telephone conference on July 31, 2000 at 3 p.m., Central Daylight Time to discuss the precise language of the order. **IT IS FURTHER ORDERED** that Tecumseh is to file and serve upon Praefke a copy of its CWD contract with Central Power by July 25, 2000.