PRAEFKE AUTO ELECTRIC & BAT-
TERY CO., INC. d/b/a Praefke Air-
cooled Engines, Plaintiff,

v.

TECUMSEH PRODUCTS
CO., Defendant.

No. 99–C–0830.

United States District Court,
E.D. Wisconsin.

Dec. 8, 2000.

James E. Snodgrass, Snodgrass & Dieringer, Brookfield, WI, Irving Zirbel, Zirbel Law Office, Scottsdale, AZ, for Plaintiff.

Larry J. Saylor, Miller Canfield Paddock & Stone, Detroit, MI, James W. Mohr, Jr., Mohr & Anderson, Hartford, WI, for Defendant.

### DECISION AND ORDER III: TECUMSEH MOTION FOR STAY PENDING APPEAL

ADELMAN, District Judge.

On October 19, 2000, I issued a preliminary injunction order pursuant to the Wisconsin Fair Dealership Law ("WFDL"), Wis. Stat. ch. 135; the order was filed the following day, October 20, 2000. This order directed defendant Tecumseh Products Co. ("Tecumseh") to reinstate plaintiff Praefke Auto Electric & Battery Co., Inc., d/b/a Praefke Aircooled Engines ("Praefke") as a Tecumesh second-tier distributor, or ASD. On October 27, 2000, Tecumseh filed a notice of appeal pursuant to 28 U.S.C. § 1292(a)(1), and simultaneously filed a motion in the district court for a stay pending appeal. Praefke filed its response brief November 2, 2000. Tecumseh's time to file a reply brief lapsed November 17, 2000. The motion is thus ripe for decision. I assume some familiarity with my decision granting the motion for preliminary injunction. (Decision and Order of July 18, 2000 [hereinafter "Dec. & Ord. I"] [docket # 25], 110 F.Supp.2d 899 (E.D.Wis.2000)).

### I. STANDARD OF REVIEW

■ Federal Rule of Civil Procedure 62(c) authorizes me in my discretion to issue a stay of the preliminary injunction order during the pendency of Tecumseh's appeal. I am to consider:

(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other

parties interested in the proceeding; and (4) where the public interest lies. *Hilton v. Braunskill,* 481 U.S. 770, 776, 107 S.Ct. 2113, 95 L.Ed.2d 724 (1987).

## II. ANALYSIS

### A. Permissibility of a Preliminary Injunction's Restoring the Status Quo Ante

■ In a portion of its brief addressing irreparable harm, Tecumseh challenges the court's power to grant a preliminary injunction reinstating a terminated WFDL dealer. Because this argument goes to the court's powers, I address it first.

Tecumseh contends that "the preliminary injunction will alter, and not preserve, the status quo as it existed before the complaint was filed." (Br. in Supp. of Def.'s Mot. for Stay [docket # 54] at 4.) Specifically, Tecumseh contends that under the relevant status quo Praefke was a third-level distributor, or RSD, and voluntarily purchased Tecumseh goods from Tecumseh's first-tier distributor, or CWD, Central Power Distributors, Inc. at RSD prices and resold them, with no markup, to RSDs in its former network. (Tecumseh does not dispute that during this same period, and indeed, even before Praefke was terminated as an ASD, Central Power began seeking to take over Praefke's network of RSDs. (Dec. & Ord. I at 33, 110 F.Supp.2d at 916).) The injunction orders Tecumseh to reinstate Praefke as an ASD; allow it to purchase goods at ASD prices; and—crucially—allow it to appoint, monitor, and service RSDs. This is what Tecumseh contends impermissibly alters, rather than preserves, the status quo.[1]

This argument would not be available if Praefke had received the required advance notice that it was to be terminated as a Tecumseh ASD and had been able to file suit to enjoin the threatened termination. *See Menominee Rubber Co. v. Gould, Inc.,* 657 F.2d 164 (7th Cir.1981) (after grantor provided 90 days' advance notice of termination, dealer sought and received preliminary injunction to prevent termination of dealership; Seventh Circuit upheld the preliminary injunction, citing the "preserving the status quo" standard). But Praefke had no advance notice. (Dec. & Ord. I at 7; 110 F.Supp.2d at 904.) This violated the WFDL, because, as pertinent here, a grantor must provide a dealer with at least 90 days' prior written notice of termination. Wis. Stat. § 135.04. Tecumseh's position is thus that if a grantor complies with the law's notice requirements, as Gould did in *Menominee Rubber,* a preliminary injunction can prevent it from terminating a dealership; but that if the grantor presents a dealer with its termination as a *fait accompli,* in violation of the law's notice requirements, then the courts are powerless to order the dealership reinstated during the pendency of litigation. This position is utterly contrary to the WFDL's public policies as announced by the Wisconsin Legislature of ensuring that dealers be given advance notice of impending terminations and of preventing grantors from wielding their power to gain unfair advantage. Wis. Stat. §§ 135.025(2)(b), 135.04.[2]

---

1. I previously addressed this issue as follows:

   Tecumseh also contends that the relevant former status quo was not Praefke's being an ASD, but Praefke's being a non-ASD and Central Power's appropriating its territory and distribution network of RSDs. But by statute, the WFDL allows temporary injunctions to be granted for WFDL violations. *See* Wis. Stat. § 135.065. Such violations by definition involve the termination, cancellation, failure to renew, or substantial change of dealership agreements. *See id.* § 135.03. Tecumseh may not profit by causing Praefke to be terminated without cause and

without notice, and then asserting that Praefke cannot receive preliminary relief because the status quo changed before it could bring suit.

(Dec. & Ord. I at 36–37, 110 F.Supp.2d at 917 (E.D.Wis.2000)).

Tecumseh characterizes this analysis as "scant," (Br. in Supp. of Def.'s Mot. for Stay at 4), but makes no effort to show that it is mistaken.

2. *See also Developments in the Law—Injunctions,* 78 Harv. L.Rev. 994, 1057 (1965) (footnotes omitted):

Even more fundamentally, and even if the WFDL did not have a notice requirement, Tecumseh's position rests on a misconception of the purpose of a preliminary injunction. Tecumseh is correct that this purpose is often stated as being to preserve the status quo pending a final hearing on the merits. *Dos Santos v. Columbus–Cuneo–Cabrini Med. Ctr.*, 684 F.2d 1346, 1350–51 (7th Cir.1982). But the courts define "status quo" as the last peaceable, uncontested status of the parties which preceded the actions giving rise to the issue in controversy. *Westinghouse Elec. Corp. v. Free Sewing Mach. Co.*, 256 F.2d 806, 808 (7th Cir.1958). As the Fifth Circuit has stated:

> It must not be thought, however, that there is any particular magic in the phrase 'status quo.' The purpose of a preliminary injunction is always to prevent irreparable injury so as to preserve the court's ability to render a meaningful decision on the merits. It often happens that this purpose is furthered by preservation of the status quo, but not always. If the currently existing status quo itself is causing one of the parties irreparable injury, it is necessary to alter the situation so as to prevent the injury, either by returning to the last uncontested status quo between the parties, by the issuance of a mandatory injunction, or by allowing the parties to take proposed action that the court finds will minimize the irreparable injury. The focus always must be on prevention of injury by a proper order, not merely on preservation of the status quo.

*Canal Authority v. Callaway*, 489 F.2d 567, 576 (5th Cir.1974) (citations omitted). Thus, in *American Can Co. v. A.B. Dick*,

> It has long been thought that preliminary orders seek to preserve the *"status quo"*; equity would not disturb the *status quo* by a preliminary injunction .... But some courts have gone so far as to state that a completed wrong can never be undone by a preliminary injunction. If this doctrine were followed as unswervingly as the language of many opinions suggests, it would encourage self-help by putting a premium

No. 83 Civ. 5435–CLB, 1983 WL 2198, at *13 (S.D.N.Y.1983) Bus. Franchise Guide (CCH) ¶ 8097, the court declined to grant a preliminary injunction in part on the ground that, "[c]learly, the 'last uncontested status' of the parties in the instant case existed prior to American Can's assignment by subterfuge or restructure, of its duties under the Distribution Agreement to ATI." Just as clearly, the last uncontested status of the parties in this case is that which existed before Praefke was terminated as an ASD, rather than a status that existed after it was terminated without notice.

Even without referring to the last uncontested status of the parties, the courts refer to preliminary injunctions under the WFDL forcing grantors to reinstate terminated dealerships as "preserving" the status quo. *Lakefield Telephone Co. v. Northern Telecom, Inc.*, 656 F.Supp. 813, 815 (E.D.Wis.1987) (granting preliminary injunction reinstating dealership after expressly stating purpose of preliminary injunction is to preserve the status quo); *Napp v. Steelcase*, Bus. Franchise Guide (CCH) ¶ 8097 (Wis.Cir.Ct.1993) (court previously granted preliminary injunction reinstating terminated dealership, and ordered further injunction prohibiting grantor from terminating dealership pending appeal "in order to preserve the existing state of affairs"). *See also, e.g., Reinders Bros., Inc. v. Rain Bird Eastern Sales Corp.*, 627 F.2d 44, 46 (7th Cir.1980) (affirming grant of preliminary injunction reinstating terminated dealer).

For these reasons, I find that the WFDL authorizes the courts to issue preliminary injunctions reinstating terminated

> on *faits accomplis*. To avoid such ill effects, courts have produced exceptions and reinterpretations of the rule that result in decisions much like those that might have come after an investigation of the relative burdens and probabilities of final success. A common exception to the *status quo* rule is found in cases involving acts prohibited by statute.

dealerships, just as surely as it authorizes courts to issue preliminary injunctions enjoining merely threatened terminations.

## B. Likelihood of Prevailing on the Merits

■ I now address Tecumseh's arguments addressed to staying the injunction. I previously found that Praefke is likely to prevail on the merits of the underlying lawsuit. (Dec. & Ord. I at 11–32, 110 F.Supp.2d at 906–15.) Tecumseh states that the most critical issue on appeal is the application of *Bong v. Cerny*, 158 Wis.2d 474, 479, 463 N.W.2d 359 (Ct.App.1990), which, according to Tecumseh, holds that there is no contractual relationship between a manufacturers and a sub-distributor, and thus—presumably—there is no dealership under the WFDL.[3] However, *Bong* expressly recognized that "[t]he statutory definition of 'dealership' *includes* an agreement between *two* parties which grants a dealership to a *third* party." *Id.* at 480, 463 N.W.2d 359 (emphasis added). *Bong* found that there was no dealership on the facts before it in part because "Tech Rubber [the manufacturer] entered no agreement with the Bongs [the sub-distributors] or with the Neumans [the distributors] by which Tech Rubber granted to the Bongs the right to sell or distribute Tech Rubber goods." *Id.* at 479, 463 N.W.2d 359. This was the portion of *Bong* on which I relied in finding that Tecumseh's CWD contract with H.R.R. Zimmerman Co., d/b/a Industrial Engine & Parts ("Industrial") (Praefke's original CWD distributor) was insufficient to make Praefke a dealer under the WFDL. (Dec. & Ord. I at 13; 110 F.Supp.2d at 907.)

---

**3.** Tecumseh further contends that *Bong* also holds that there is no "community of interest" between a manufacture and sub-distributor. (Br. in Supp. of Def.'s Mot. for Stay at 4.) *Bong* discusses the WFDL's requirement for a community of interest only in its second-to-last paragraph, and that paragraph does not support Tecumseh's assertion. *Bong,* 158 Wis.2d at 485, 463 N.W.2d 359.

However, I found that Tecumseh (the manufacturer) entered an agreement *both* with Praefke (the sub-distributor) *and* with Industrial (the distributor)—specifically, the ASD contract that both Tecumseh and Industrial signed. To be sure, the Tecumseh-drafted ASD contract asserted that Tecumseh was not a party, even though it required Tecumseh approval before it would become effective; but I found that this "not a party" clause violated the WFDL and was void and unenforceable as a matter of law (Dec. & Ord. I at 17–19, 110 F.Supp.2d at 909–10), and Tecumseh has not contested this finding. Because the contract also included promises flowing directly from Tecumseh to Praefke and directly from Praefke to Tecumseh, I found that Tecumseh was a party to the contract granting Praefke its dealership. (Dec. & Ord. I at 15–17.) On that basis, *Bong* affirms my finding that Tecumseh was a grantor of Praefke's dealership. I do not find that Tecumseh has made a strong showing that it is likely to prevail on the merits.

## C. Irreparable Injury Absent a Stay

■ Tecumseh next contends that it will suffer irreparable injury without a stay. I addressed above Tecumseh's primary argument under this heading, namely, that the injunction improperly alters rather than preserves the status quo. Tecumseh makes three additional arguments that are on point: That the injunction will require it to set up an entirely new distribution system to distribute goods directly to Praefke; that setting up this distribution system will impose irreparable injury; and that the injunction forces it to continue an unsatisfactory relationship.[4]

---

**4.** Relying upon *Midwest Perishables, Inc. v. Jack Frost, Inc.,* [New Developments] Bus. Franchise Guide (CCH) ¶ 9467 (W.D.Wis. Aug. 25, 1989), Tecumseh also argues that Praefke is not entitled to the preservation of a state of affairs that ceased to exist long before it filed its motion. This argument has nothing to do with whether Tecumseh will suffer irreparable harm, and so I consider it in the

### 1. Alleged Irreparable Injury Due to Direct Distribution

In its brief in opposition to Praefke's motion for a preliminary injunction, Tecumseh asserted that it would suffer irreparable harm because of what it then described as "the substantial *expense* of creating an entirely new distribution system just to supply Praefke." (Def.'s Br. in Opp'n to Pl.'s Mot. for Temporary Inj. [docket # 17] at 26) (emphasis added). Tecumseh did not dispute Praefke's estimate that Tecumseh will earn approximately $70,000 *more* per year under the injunction than without the injunction. (Schlamp Aff. of 9/21/2000 [docket # 38] ¶ 12; Polster Decl. of 10/2/2000 [docket # 43] ¶ 14.) I previously found that Tecumseh will indeed undergo some substantial expenses in creating the new distribution system (Mem. re. Preliminary Inj. Security Bond (Oct. 20, 2000) [docket # 48]), and, pursuant to my order, Praefke has posted $25,000 in security to reimburse Tecumseh for those expenses, should the injunction ultimately prove to have been improvidently granted. I find that leaving the injunction in place pending appeal will not impose an irreparable financial hardship upon Tecumseh.

Tecumseh's assertion that it will suffer irreparable injury if it distributes its goods directly to Praefke must thus rest upon non-financial hardships. However, Tecumseh has not asserted any such irreparable harms, either in its brief in opposition to the preliminary injunction, or in its present brief in support of its motion for a stay of the injunction. (Def.'s Br. in Opp'n to Pl.'s Mot. for Temporary Inj. at 26); Br. in Supp. of Def.'s Mot. for Stay at 4.) [5] To be sure, after I ordered briefing on the wording of the injunction order and on the amount of Praefke's injunction security, Tecumseh asserted that the injunction would impose certain non-quantifiable harms, such as jeopardizing its relationship with Central Power and changing the way it operates. (Melius Aff. of 9/14/2000 [docket # 35] ¶ 9.) But Tecumseh has not raised such concerns in its present motion for a stay, thereby likely waiving them for purposes of assessing the propriety of a stay pending appeal. Even assuming that these concerns are properly before me, Tecumseh has never asserted that such harms would be irreparable, and I find no basis in the record to find that they might be. I accordingly find that even if Tecumseh suffers any non-financial harms as a result of directly distributing its goods to Praefke, they will not be irreparable.

### 2. Alleged Necessity of Tecumseh's Directly Distributing Goods to Praefke

Tecumseh asserts that the injunction will force it to distribute its goods directly to Praefke because its current CWD, Central Power, "refuses to service Praefke as an ASD, as it has every right to do under its agreement with Tecumseh." (Br. in Supp. of Def.'s Mot. for Stay at 4.) The evidence before the court, however, contradicts this assertion.

Tecumseh asserts that there is no written CWD contract setting out Central Power's obligations for the relevant territory in eastern Wisconsin, formerly served by Industrial. Nonetheless, Tecumseh and Central Power's CWD contract covering Minnesota, western Wisconsin, and portions of three other states, has been in effect since 1988, and covers not only the territory as comprised at signing, but "the Territory as it shall from time to time be comprised." (Polster Decl. Ex. 2 (1988 Central Power CWD agreement between Tecumseh and Central Power) [hereinafter "Central Power Minnesota CWD contract"] ¶ (b–1).) Tecumseh advised eastern Wisconsin ASDs and RSDs on March

---

next section, on whether Praefke would suffer substantial harm if a stay were issued.

**5.** Tecumseh's failure to raise such arguments before the district court may lead the Seventh Circuit to find that it waived the right to raise them before that court.

9, 1999 that "Central Power Distributors, Inc. headquartered in Anoka, Minnesota and a long-time CWD, has had their geographic territory expanded and will be the Central Warehouse Distributor for your area, effective March 26, 1999." (Polster Decl. Ex. 2 (Polster letter of 3/9/1999).) Tecumseh thus clearly regarded Central Power's assumption of responsibility for the eastern Wisconsin territory as an expansion of Central Power's territory under its existing Minnesota CWD contract. In the absence of any evidence to the contrary, the Minnesota contract therefore covers the eastern Wisconsin territory. Not only is there no evidence to the contrary, but Tecumseh itself has relied upon the Minnesota contract in this litigation, in describing Central Power's responsibilities in eastern Wisconsin: "Central Power's discretion with regard to appointing an ASD is addressed in Paragraph (b–4) of the Minnesota agreement." (Polster Decl. ¶ 15.)

The importance of this contract is that, in Paragraph (b–5), Central Power agreed to distribute Tecumseh goods to every ASD within its territory. Central Power agreed:

> (b–5) To cause the Authorized Service Distributors and the Registered Service Dealers in the Territory to carry a sufficient stock of Engines, Power Train Components and Parts and the tools and equipment necessary for efficient servicing of Engines and Power Train Components, as well as Parts anticipated by the Company to be needed for the ser-

vicing of new models of Engines and Power Train Components as such models or made ready for the market.

(Central Power Minnesota CWD contract ¶ (b–5).) Central Power also agreed:

> (b–1) To act as a Central Warehouse Distributor in the Territory as it shall from time to time be comprised and in such capacity to exercise its best efforts in the promotion and sale of Engines, Power Train Components and Parts and to maintain and travel an adequate force of Salesman to properly service the territory.
>
> (b–2) To purchase from the Company and carry in stock a supply of Engines, Power Train Components and Parts sufficient to meet the needs of the Central Warehouse Distributor and the needs of the Authorized Service Distributors and the Registered Service Dealers in the Territory.

(*Id.* ¶¶ (b–1), (b–2).) [6]

Tecumseh thus has the contractual right to demand that Central Power use its best efforts to promote and sell Tecumseh goods throughout its territory, including Praefke's territory; to demand that Central Power purchase and stock sufficient Tecumseh goods to meet the needs of all ASDs in its territory, including Praefke; and to demand that Central Power cause all ASDs in its territory, including Praefke, to carry a sufficient stock of Tecumseh goods.[7] Tecumseh's assertion that Central Power "has every right to [refuse to service Praefke as an ASD] under its agree-

---

**6.** The contract is a standard Tecumseh-drafted contract; other than the description of the territory, Tecumseh's CWD contract with Industrial for eastern Wisconsin was identical. (Exs. in Supp. of Pl.'s Mot. for Temp. Inj. [docket # 14] Ex. 9.)

**7.** Even if Tecumseh would have the court believe that Central Power is bound in eastern Wisconsin by Paragraph (b–4) of the Minnesota contract, but not by Paragraphs (b–1), (b–2), or (b–5), it is too late for Tecumseh now to make such a claim. I previously ordered Tecumseh to provide the court with a copy of its agreement with Central Power for eastern

Wisconsin. (Dec. & Ord. I at 37, 38, 110 F.Supp.2d at 918.) Tecumseh filed nothing (although it did inform the court in a July 31, 2000 telephone conference that there was no written contract). Given that Tecumseh did not provide the court with a copy of Central Power's Minnesota contract in July 2000, when apparently not to its advantage, but relied upon that contract in October 2000, when it apparently was to its advantage, Tecumseh is not now in a position to claim that some clauses of that contract apply in eastern Wisconsin but others do not.

ment with Tecumseh" (Br. in Supp. of Def.'s Mot. for Stay at 4) is therefore not credible. On that basis, I find that even if distributing goods directly to Praefke would somehow subject Tecumseh to irreparable harm, such harm would befall Tecumseh only if it acquiesced in Central Power's breaching its CWD contract, and not as a result of this court's injunction.

### 3. Alleged Irreparable Harm of Continuing Unsatisfactory Relationship

Tecumseh next contends that under *Tele–Controls, Inc. v. Ford Industries, Inc.*, 388 F.2d 48, 49 (7th Cir.1967), preliminary injunctions should not force the continuation of an unsatisfactory dealership relationship. But to the contrary, *Tele–Controls* merely found that courts may consider the continuation of an unsatisfactory relationship in balancing harms, not that the presence of this factor dictates denying a preliminary injunction.

Even so understood, *Tele–Controls* does not help Tecumseh, for two reasons. The first is that the factual predicate is absent; there is no evidence in the record that Tecumseh ever found its forty-year relationship with Praefke unsatisfactory. Tecumseh's position throughout this litigation—including in this very motion for a stay—has consistently been that it has never had any grievance with Praefke, but that Central Power unilaterally decided not to appoint Praefke as an ASD, with no input from Tecumseh. (Melius Decl. of 12/13/1999 ¶ 19 [docket # 18]; Br. in Supp. of Def.'s Mot. for Stay at 5). Tecumseh has never disputed the evaluation of its chosen CWD, Central Power, that Praefke is the "best of the best." (R. Schmidt Aff. 11/10/1999 [docket # 15] ¶ 18).

The second problem is that the argument is contrary to public policy as stated by the Wisconsin Legislature. The WFDL expressly provides for injunctive relief, *see* Wis. Stat. § 135.06, and expressly states that any violation of the WFDL by the grantor "is deemed an irreparable injury to the dealer for determining if a temporary injunction should be issued." Wis. Stat. § 135.065. The Wisconsin Legislature declared that the WFDL's underlying purposes and policies include protecting dealers against unfair treatment by grantors and "provid[ing] dealers with rights and remedies *in addition to those existing by contract or common law.*" Wis. Stat. §§ 135.025(1), (2)(b), (2)(c) (emphasis added). Thus, the Wisconsin Legislature contemplated precisely that where a grantor terminates a dealership in violation of the WFDL, a court may issue a temporary injunction to protect the dealer from unfair treatment, even if contract and common law would not provide such a remedy. If Tecumseh's position were accepted, such injunctions would never issue, because by definition they require grantors to continue dealership relationships that they saw fit to terminate. Tecumseh's position is thus irreconcilable with both the public policy of the WFDL and with its statutory presumption that any WFDL violation is an irreparable harm for temporary injunction purposes.

### D. Substantial Injury to Other Parties

Tecumseh argues that Praefke would not be substantially injured by a stay pending appeal because of delays before and during this litigation. Praefke was told on March 24, 1999 that it was being terminated as a Tecumseh ASD. It filed suit against Tecumseh four months later, on July 22, 1999, and demanded a temporary injunction in its complaint. (Compl. at 14.) It filed a formal motion for preliminary injunction two-and-a-half months later, on October 8, 1999. Tecumseh raises two arguments based upon delay. Its first argument (raised, as noted above, under the heading of irreparable harms to Tecumseh) is that Praefke is not entitled to the preservation of a state of affairs that ceased to exist long before it filed its motion. (Br. in Supp. of Def.'s Mot. for Stay at 4.) The second argument is based on the duration of this litigation to date.

### a. Laches Distinguished

■ I first distinguish the traditional equitable defense of laches. This is the doctrine that equity aids the vigilant, not those who slumber on their rights, and it is an application of the more general principle that those who seek equity must do equity. 2 John Norton Pomeroy, *A Treatise on Equity Jurisprudence* § 418 at 169–70 (Spencer W. Symons ed., 5th ed.1941). However, laches will bar a suit brought in equity only where the plaintiff has failed to exercise reasonable diligence and where the defendant has been prejudiced by the delay. *Id.* at 171–72. Tecumseh has alleged neither a lack of diligence on Praefke's part, nor that it has been prejudiced by delay, and has not sought the dismissal of Praefke's suit based upon alleged unreasonable delay. In addition, laches is an affirmative defense that must be pled in the answer, *see* Fed.R.Civ.P. 8(c), and Tecumseh's Answer did not do so (Ans. and Affirmative Defenses [docket # 3] at 6). The equitable defense of laches is thus not at issue here.

### b. Evidentiary Value of Plaintiff's Delay in Assessing Irreparable Harm

■ However, a plaintiff's delay is sometimes used for evidentiary purposes in the preliminary injunction context, as evidence of whether the plaintiff would suffer irreparable harm without an injunction. (To make matters confusing, this evidentiary question is occasionally called a laches defense to a preliminary injunction.) The principle is that a plaintiff's extended delay in seeking relief "undercuts the sense of urgency that ordinarily accompanies a motion for preliminary relief and suggests that there is, in fact, no irreparable injury." *Rexnord, Inc. v. Laitram Corp.*, 628 F.Supp. 467, 473–74 (E.D.Wis.1986); *see also* 11A Charles Alan Wright, Arthur R. Miller, and Mary Kay Kane, *Federal Practice and Procedure* § 2948.1 at 156 (2nd ed.1995). This is the principle applied in the unpublished decision cited by Tecumseh, *Midwest Perishables*, for it was in the context of assessing whether the plaintiff would suffer irreparable harm without an injunction that Judge Crabb stated that she declined to issue injunctive relief to remedy a two-year-old alleged violation of the WFDL. *Midwest Perishables*, [New Developments] Bus. Franchise Guide (CCH) ¶ 9467.

Praefke's delay here—four months before filing suit and demanding a temporary injunction, and another two-and-a-half months before formally moving for a preliminary injunction—is not excessive, nor is it inconsistent with irreparable harm. In *Ideal Industries, Inc. v. Gardner Bender, Inc.*, 612 F.2d 1018, 1025 (7th Cir.1979), the plaintiff waited seven months to file suit, and another eight months to move for a preliminary injunction, but the Seventh Circuit affirmed the district court's finding of irreparable harm. Likewise in *Porsche Cars North America, Inc. v. Manny's Porshop, Inc.*, 972 F.Supp. 1128, 1132–33 (N.D.Ill.1997), the court found irreparable harm for preliminary injunction purposes, even though the plaintiff delayed for *ten years* before bringing suit.[8]

---

**8.** I note that—apparently alone among the courts of appeals—the Seventh Circuit has imported equitable laches standards into the evidentiary question of whether a plaintiff's delay in seeking a preliminary injunction undercuts its assertion of irreparable harm. In *Ideal Industries*, the Seventh Circuit stated that delay is only one of several factors to be considered; the cases "do not support a general rule that irreparable injury cannot exist if the plaintiff delays in filing its motion for a preliminary injunction." *Ideal Industries*, 612 F.2d at 1025. Specifically, the court held, the defendant must also establish that it "had been lulled into a false sense of security or had acted in reliance on the plaintiff's delay" in moving for a preliminary injunction. *Id.* This holding has been followed by several district courts in the circuit. *See, e.g., Ty, Inc. v. Jones Group, Inc.*, 98 F.Supp.2d 988, 992 (N.D.Ill.2000) (finding irreparable harm even though plaintiff waited eight months to move for preliminary injunction; "it cannot be said that this minimal delay lulled Defendant into a false sense of security, nor that the delay was unreasonable.").

Even when a plaintiff's delay in seeking a preliminary injunction is so protracted as to provide some evidence against irreparable harm, such delay standing alone does not overturn any presumptions of irreparable injury that otherwise apply. *Vaughan Mfg. Co. v. Brikam Intern., Inc.*, 814 F.2d 346, 351 (7th Cir.1987) (applying general rule that irreparable injury is readily found where one competitor uses the trademark of another, even though plaintiff delayed seeking preliminary injunction for at least nine months after learning of defendant's alleged infringement); *Ideal Indus.*, 612 F.2d at 1026 (same). Thus, even if Praefke's four-month plus two-and-a-half month delay were excessive, Tecumseh's terminating Praefke in violation of the WFDL would still be deemed irreparable injury under Wisconsin law. Wis. Stat. § 135.065. For these reasons, Tecumseh's delay-based argument does not persuade me, and I find that Praefke would suffer substantial harm if the injunction were stayed pending appeal.

### c. Delay in Preliminary Injunction's Issuance as Factor for Stay

■ Tecumseh next argues that the preliminary injunction should be stayed because of the delays that have already occurred in this suit. (Br. in Supp. of Def.'s Mot. for Stay at 5.) Specifically, Tecumseh contends, the fact that Praefke did not go out of business—and in fact continued selling Tecumseh goods to other RSDs before the preliminary injunction reinstated it as an ASD—proves that Preafke will suffer no irreparable injury if the preliminary injunction is stayed while the appeal is pending.

This misconceives the basis for my finding that Praefke would suffer irreparable injury. In the first instance, the WFDL itself provides that any violation is deemed an irreparable injury. In the second instance, although Praefke surely faced financial hardship in losing its 37.9% mark-up from the ASD price in reselling to RSDs, I found irreparable injury primarily because Praefke faced the continuous diminution of its network of 110 RSDs due to incursions by Central Power. (Dec. & Ord. I at 3 & n.1, 33, 110 F.Supp.2d at 902 & n. 1, 916). Without the injunction, Praefke would presumably have no power to re-appoint its RSDs. An ASD's central duties include developing, appointing and training a network of RSDs. (Dec. & Ord. I at 29, 110 F.Supp.2d at 914; Decision and Order II of Sept. 6, 2000 at 3–4.) Without the injunction, Praefke's hard-won network would continue to slowly slip away. This is a classic loss of good will, and the Seventh Circuit recognizes the loss of goodwill as an irreparable harm. *Meridian Mut. Ins. Co. v. Meridian Ins. Group, Inc.*, 128 F.3d 1111, 1120 (7th Cir. 1997); *Gateway Eastern Ry. Co. v. Terminal R.R. Ass'n*, 35 F.3d 1134, 1140 (7th Cir.1994); *Reinders*, 627 F.2d at 53 & n. 7 (noting that even though WFDL dealer sold several manufacturer's brands and was in no danger of going bankrupt without a preliminary injunction, irreparable harm was nonetheless established because plaintiff could lose "a small but valuable part of its clientele, a loss not compensable in monetary damages").

Tecumseh's argument is thus that because Praefke has already suffered some loss of goodwill—as well as the statutory presumption of irreparable harm—during the pendency of this case to date, Praefke should be allowed to suffer further during the pendency of Tecumseh's appeal. Tecumseh cites no authority for this proposition, and I can find none.

Finally, Tecumseh draws attention to this court's role in the preliminary injunction's issuing twenty months after Tecum-

I believe that these cases mistakenly conflate the equitable defense of laches with the evidentiary issue of what the plaintiff's delay indicates about the urgency of the harm it faces. But to the extent that these cases state the correct rule, Tecumseh has asserted neither that it was lulled into complacency by Praefke's delay, nor that it acted in reliance upon that delay.

seh terminated Industrial. The order granting Praefke's motion for a preliminary injunction issued July 18, 2000, nine-and-a-half months after the motion was filed; it took another three months for the parties and the court to finalize the form of the injunction. But Praefke's entitlement to a preliminary injunction (and Tecumseh's entitlement to a stay pending appeal) have nothing to do with how crowded the district court's calendar is. *Ideal Industries,* 612 F.2d at 1025 (affirming preliminary injunction where district court took twenty-two months to grant plaintiff's motion for preliminary injunction, apparently due to its calendar).

### E.   Public Interest

██   Tecumseh contends that forcing it to alter its distribution system for one dealer would not be in the public interest. However, as discussed above, Tecumseh has the contractual authority to demand that Central Power serve and distribute goods to all Tecumseh ASDs in its territory, including Praefke. I have in addition found that several of Tecumseh's arguments for a stay are directly contrary to public policy as announced by the Wisconsin Legislature. I reject Tecumseh's contention that the public interest demands a stay.

**NOW, THEREFORE, IT IS HEREBY ORDERED** that defendant Tecumseh's motion for a stay pending appeal (docket # 53) is **DENIED.**

**IT IS FURTHER ORDERED** that a copy of this decision shall be sent to the Circuit Clerk for the Seventh Circuit Court of Appeals, 219 S. Dearborn St., Chicago, IL 60604.