**BUILDING AND CONSTRUCTION TRADES DEPARTMENT, AFL–CIO, et al., Plaintiffs,**

v.

**Joe M. ALLBAUGH, Director Federal Emergency Management Agency, et al., Defendants.**

**No. 01–00902 (EGS).**

United States District Court, District of Columbia.

Oct. 17, 2001.

Laurence J. Cohen, Esquire, Terry R. Yellig, Esquire, Victoria L. Bor, Esquire,

Jonathan D. Newman, Esquire, Sherman, Dunn, Cohen, Leifer & Yellig, P.C., Washington, D.C., Counsel for Plaintiffs.

Raymond Larizza, Esquire, U.S. Department of Justice, Civil Division, Washington, D.C., Counsel for Defendants.

Arnon D. Siegel, Esquire, Robbins, Russell, Englert, Orseck & Untereiner, Washington, DC, Counsel for amicus New York State Thruway Authority.

Kristian M. Dahl, Esquire, National Right to Work, Springfield, VA, Counsel for amicus National Right to Work Legal Defense Foundation.

Maurice Baskin, Esquire, Venable, Baetjer, Howard & Civiletti, LLP, Washington, DC, Counsel for amicus Associated Builders, Inc.

Terri E. Gerstein, Esquire, Attorney General of the State of New York, New York City, Counsel for amicus State of New York.

Stanley Mallison, Esquire, Milberg, Weiss, Bershad, Hynes & Lerach, LLP, San Francisco, CA, Counsel for amicus National Economic Development & Law Center.

Michael D. Berman, Deputy Chief of Litigation, Edward S. Harris, Counsel, Kevin Reynolds, Asst. Atty. Gen., Linda D. Strozyk, Deputy Counsel, Maryland Department of Transportation, for amicus Maryland DOT.

## AMENDED FINDINGS OF FACTS AND CONCLUSIONS OF LAW AND PRELIMINARY INJUNCTION

SULLIVAN, District Judge.

### FINDINGS OF FACT

#### A. The Executive Order

1. President George W. Bush issued Executive Order No. 13202 on February 17, 2001, and amended it on April 4, 2001. 66 Fed.Reg. 11225 (Feb. 22, 2001) and 66 Fed.Reg. 18717 (April 11, 2001) (attached as Exhibits 1 and 2, respectively, to Plaintiffs' Motion for Summary Judgment or, in the Alternative, Application for Preliminary Injunction (hereinafter "Pls. Mot.")).

2. In issuing Executive Order No. 13202 ("Executive Order"), President Bush invoked the "authority vested in [the President] by the Constitution and the laws of the United States of America, including the Federal Property and Administrative Services Act, 40 U.S.C. § 471 *et seq....*" ("the Procurement Act"). (66 Fed.Reg. at 11225, § 1; Ex. 1 to Pls. Mot.). President Bush did not specify any "law of the United States" other than the Procurement Act as the basis of his authority.

3. Section One of the Executive Order applies to contracts with the Federal Government, and states:

> any executive agency awarding any construction contract after the date of this order, or obligating funds pursuant to such a contract, shall ensure that neither the awarding Government authority nor any construction manager acting on behalf of the Government shall, in its bid specifications, project agreements, or other controlling documents:
>
> (a) Require or prohibit bidders, offerors, contractors, or subcontractors to enter into or adhere to agreements with one or more labor organizations, on the same or other related construction project(s); or
>
> (b) Otherwise discriminate against bidders, offerors, contractors, or subcontractors for becoming or refusing to become or remain signatories or otherwise to adhere to agreements with one or more labor organizations, on the same or other related construction project(s).
>
> (c) Nothing in this section shall prohibit contractors or subcontractors from voluntarily entering into agreements described in subsection (a).

*Id.*

4. The Executive Order also applies to federally assisted construction projects, and states in Section Three:

any executive agency issuing grants, providing financial assistance, or entering into cooperative agreements for construction projects, shall ensure that neither the bid specifications, project agreements, nor other controlling documents for construction contracts awarded after the date of this order by the recipients of grants or financial assistance or by parties to cooperative agreements, nor those of any construction manager acting on their behalf, shall contain any of the requirements or prohibitions set forth in section 1(a) or (b) of this Order.

*Id.*

5. Both §§ 1 and 3 of the Executive Order are at issue in this case.

6. The Executive Order grants federal executive agencies discretion to exempt projects on which a project labor agreement was in effect, and on which at least one construction contract had been awarded prior to the Executive Order's February 17, 2001, effective date. (66 Fed.Reg. at 18718; Ex. 2 to Pls. Mot.).

7. The Executive Order also grants federal executive agencies discretion to exempt projects if they find "that special circumstances require an exemption in order to avert an imminent threat to public health or safety or to serve the national security." (66 Fed.Reg. at 11226, § 5(a); Ex. 1 to Pls. Mot.). The Executive Order specifically excludes consideration of "the possibility or presence of a labor dispute concerning the use of contractors or subcontractors who are nonsignatories to . . . [collective bargaining] agreements . . . or concerning employees on the project who are not members of or affiliated with a labor organization" as "special circumstances" warranting an exception. (66 Fed.Reg. at 11226, § 5(b); Ex. 1 to Pls. Mot.).

8. The Executive Order directs the heads of executive agencies to comply with its terms for all contracts awarded, and funds obligated, after the date the Executive Order was signed, February 17, 2001. The Executive Order is therefore self-executing. (66 Fed.Reg. at 11225, §§ 1 and 3; Ex. 1 to Pls. Mot.).

9. The Executive Order directs the Federal Acquisition Regulatory Council ("FAR Council") to amend the Federal Acquisition Regulation ("FAR") to incorporate the Executive Order's terms. (66 Fed.Reg. at 11226, § 7; Ex. 1 to Pls. Mot.). Because the FAR only applies to federal contracting, and not federal financial assistance, any amendment would incorporate the terms of Section One, and not Section Three, of the Executive Order.

10. On May 16, 2001, the Department of Defense, General Service Administration ("GSA"), and National Aeronautics and Space Administration ("NASA"), published an interim rule amending the Federal Acquisition Regulation ("FAR") to incorporate the Executive Order. 66 Fed. Reg. 27414 (May 16, 2001) (Ex. 3 to Pls. Mot.). Under authority of defendants Secretary of Defense Rumsfeld, Acting GSA Administrator Davis and NASA Administrator Goldin, the interim rule was promulgated without prior opportunity for public comment in order to comply with the. Executive Order's directive that the FAR Council amend the FAR within 60 days of the Executive Order's issuance. (*Id.* at 27415). The interim rule took effect on May 16, 2001. (*Id.* at 27414).

### B. *Project Labor Agreements*

11. A project labor agreement ("PLA") is a special kind of multi-union, multi-employer collective bargaining agreement in the construction industry, designed to establish uniform terms and conditions of employment, and to systematize labor rela-

tions across a construction project. (Second Declaration of Edward C. Sullivan ("Second Sullivan Dec.") at ¶ 5, Ex. 4 to Pls. Mot.).

12. PLAs typically contain two clauses that ensure that the PLA is applied and enforced across the construction site. First, PLAs require the entity issuing bids for the construction project to include a specification requiring any employer awarded a contract to abide by the PLA. Second, PLAs include a clause requiring the employer to contract or subcontract work only to an employer that agrees to be bound by the PLA. (Second Sullivan Dec. at ¶ 8, Ex. 4 to Pls. Mot.; Declaration of Michael W. D'Antuono ("D'Antuono Dec.") at ¶¶ 9 and 10, attached as Exhibit 1 to Plaintiffs' Memorandum in Opposition to Defendants' Motion to Dismiss or, in the Alternative, Motion for Summary Judgment, and Reply to Defendants' Opposition to Plaintiffs' Renewed Application for Preliminary Injunction ("Pls.Opp.")).

## C. The Building and Construction Trades Department

13. Plaintiff Building and Construction Trades Department, AFL–CIO ("BCTD"), is an organization within the AFL–CIO consisting of fourteen national and international labor organizations that represent workers in the construction industry throughout the United States and Canada. (Second Sullivan Dec. at ¶ 2, Ex. 4 to Pls. Mot.).

14. Plaintiff BCTD is the parent organization to over 300 local building and construction trades councils in the United States. One such local building and construction council is plaintiff Contra Costa Building and Construction Trades Council. (Id. at ¶ 3).

15. Plaintiff BCTD and its affiliated councils have negotiated, and continue to negotiate, numerous PLAs across the United States, involving several billions of dollars worth of construction. Many of the PLAs Plaintiff BCTD negotiated in the past were for federal public works projects and projects that are financed, at least in part, with federal financial assistance. If not for the Executive Order, Plaintiff BCTD and its councils would continue to negotiate PLAs covering federal and federally-assisted construction projects. (Id. at ¶ 4; Declaration of William "Giz" Kaczorowski at ¶¶ 6–19, Ex. 5 to Pls. Mot.).

16. One of the goals of Plaintiff BCTD and its affiliated councils is to exercise their rights under the NLRA to negotiate PLAs to systemize labor relations on construction projects, and to do so on as many projects as they are able under market conditions. To that end, Plaintiff BCTD and its councils in the past have sought, and do now and will in the future seek, to convince construction owners, managers and contractors of the value of PLAs, and to negotiate these agreements on all kinds of projects, including federal public works projects and projects supported by federal funds. (Second Sullivan Dec. at ¶ 7, Ex. 4 to Pls. Mot.).

## D. The Wilson Bridge Construction Project and PLA

17. The Woodrow Wilson Bridge replacement project is a six-year construction effort to replace the Wilson Bridge, which crosses the Potomac River on Interstate 95/495, better known as "the Capital Beltway." (Id. at ¶¶ 11–12; Declaration of Robert Douglass ("Douglass Dec.") at ¶¶ 3–6, Ex. 6 to Pls. Mot.).

18. The U.S. Congress has appropriated over $1.5 billion in federal financial assistance for this construction project. (Second Sullivan Dec. at ¶ 12, Ex. 4 to Pls. Mot.).

19. The State of Maryland is responsible for constructing the Bridge structures crossing the Potomac River, as well as the highways and interchanges on the Maryland side of the Bridge. The Commonwealth of Virginia is responsible for constructing the highways and interchanges located in Virginia. (*Id.* at ¶ 13).

20. The State of Maryland decided to authorize negotiation of a PLA to accomplish its objectives on this construction project, while the Commonwealth of Virginia determined not to use a PLA. (*Id.*). (The Maryland portion of the Wilson Bridge construction will hereinafter be referred to as "the Project").

21. The State of Maryland retained Parsons Constructors, Inc. ("Parson Constructors"), to manage and control labor relations on the Project and authorized it to negotiate a PLA for Maryland's portion of the Project. The resulting agreement covers the construction of twin six-lane drawbridge spans across the Potomac River and the Maryland highway interchanges, and establishes the terms and conditions of employment for construction workers employed on those parts of the Project. The PLA is between Plaintiff BCTD, its affiliated National and International Unions, one of Plaintiff BCTD's affiliated Councils—the Washington Building and Construction Trades Council—and local unions affiliated with that Council, and Parsons Constructors. On January 5, 2001, the parties publicly announced the agreement. (*Id.* at ¶ 14).

22. The PLA covers six separate contract packages:

(a) The construction of the foundations for the bridge;

(b) The construction of the Bridge superstructure;

(c) The construction and replacement of certain ramps on interstate 295;

(d) The construction of local and express lanes on the "outer loop" of the Capital Beltway;

(e) The construction of local and express lanes on the Capital Beltway's "inner loop;" and

(f) The construction of two long viaducts connecting HOV lanes on the Bridge with future HOV lanes.

(*Id.* at ¶ 15 and Attachment A thereto at 4–5; Douglas Dec. at ¶ 9, Ex. 6 to Pls. Mot.).

23. In recognition of the special needs of the Project and to maintain a spirit of harmony, labor-management peace and stability during the term of the PLA, the parties agreed in the PLA to establish effective and binding methods to settle all misunderstandings, disputes or grievances that could arise under the agreement. Plaintiff BCTD and the other union parties agreed not to engage in any strikes, slow downs, or interruption of work, and the employers agree not to engage in any lockouts. (Second Sullivan Dec. at ¶ 17, Ex. 4 to Pls. Mot.).

24. The PLA provides that the State of Maryland will incorporate the PLA into the bid specifications for all construction work covered by the PLA, and that, Maryland will contract such work exclusively to those contractors who agree to execute and be bound by the terms of the PLA. (*Id.* at ¶ 16; D'Antuono Dec. at ¶ 10, Ex. 1 to Pls. Opp.).

25. The parties agreed to apply the Wilson Bridge PLA to any successful bidder for Project work, without regard to whether that successful bidder performed work at other locations on either a union or non-union basis, and without regard to whether the employees of such a successful bidder are or are not members of any union. (Second Sullivan Dec. at ¶ 18, Ex.

4 to Pls. Mot.; D'Antuono Dec. at ¶ 10, Ex. 1 to Pls. Opp.).

26. The State of Maryland initially advertised for bids for the foundation contract before negotiations for the PLA concluded. Implementation of the PLA therefore required amendment of the Invitation for Bids for the foundations contract package, specifying that adherence to the PLA would be a condition of working on the Project. (Second Sullivan Dec. at ¶ 19, Ex. 4 to Pls. Mot.).

27. Federal regulations require Maryland to award contracts for this Project on a competitive basis, and to obtain authorization from the U.S. Department of Transportation's ("DOT") Federal Highway Administration ("FHWA") before it advertises any contract on the Project for bid. 23 C.F.R. §§ 635.104(a), 630.205(e), 635.112(a). The State must also obtain FHWA approval if it intends to make a major change to an already approved plan or specification during the period the contract is advertised for bids. *Id.* § 635.112(c). Because the implementation of the PLA required an amendment to the bid advertisement for the foundations contract package, the State was required to obtain FHWA approval for this major change. FHWA approval is also necessary before any of the other contract packages may be advertised for bid. (Second Sullivan Dec. at ¶ 19, Ex. 4 to Pls. Mot.).

28. On January 9, 2001, Maryland's State Highway Administrator formally submitted the PLA and the proposed addendum to FHWA for review and approval. (*Id.*). Previously, on January 2, 2001, the State of Maryland informally submitted the PLA to FHWA for review. On January 17, 2001, FHWA submitted its recommendations for changes in the agreement, to which the parties either responded in writing or incorporated in the final PLA. (*Id.;* Ex. D–4 to *Amicus* Brief of State of Maryland).

29. On January 8, 2001, the State of Maryland informed potential bidders on the foundations contract package that the PLA had been negotiated and recommended to be included in the contract for the foundations phase of the Project. The State of Maryland attached a copy of the prospective PLA to its notice to prospective bidders, and informed those bidders that when the PLA was executed, a copy of the PLA would be issued by a future addendum to be included with the contract documents. (Second Sullivan Dec. at ¶ 20, Ex. 4 to Pls. Mot.).

30. Bids on the foundations contract package were originally due to be opened February 8, 2001, but due to delays in FHWA approval, the bid opening date was delayed until February 22, 2001, and then further delayed until March 8, 2001. (*Id.* at ¶ 21).

31. On February 21, 2001, four days after the Executive Order issued, Nelson J. Castallanos, FHWA Administrator, informed the State of Maryland that the DOT was "unable to approve a PLA for this project," because of Executive Order 13202. FHWA gave no reason other than the Executive Order for not approving the PLA for the Project. (*Id.* at ¶ 23).

32. On February 22, 2001, the contract package for the foundations phase of the Project was readvertised without any requirement that the successful bidder abide by the PLA. On March 22, 2001, the contract was awarded to Tidewater Construction Corporation/Kiewit Construction Company/Clark Construction Group, Inc. Joint Venture of Virginia Beach, VA ("Tidewater"). (*Id.* at ¶ 24).

33. After the DOT nullified the PLA, but before the foundations contract package was awarded, Plaintiff BCTD and offi-

cials of its affiliated entities had a meeting with several entities that submitted bids for the foundations contract package for the purpose of preliminarily exploring whether, if awarded the contracts, those entities would be amenable to entering into a prehire agreement covering the work associated with the foundations contract package. Officials from Tidewater were not present at this meeting. (*Id.* at ¶ 25).

34. After the foundations contract package was awarded to Tidewater, Plaintiff BCTD and officials of its affiliated entities had preliminary conversations with Tidewater officials to determine if Tidewater would be interested in negotiating a labor agreement covering the foundations phase of the project. Tidewater made it very clear that it would not enter into any labor agreement of any kind. (*Id.* at ¶ 26).

35. The package of contracts for the construction of the Bridge foundations is the only package within the scope of the PLA that has been awarded thus far. (*Id.* at ¶ 27; Douglass Dec. at ¶ 10, Ex. 6 to Pls. Mot.). The contract package for the construction of the Bridge Superstructure is scheduled to be advertised for bid on August 14, 2001. (Douglass Dec. at ¶ 10, Ex. 6 to Pls. Mot.). This is the most significant portion of the Bridge construction, valued at $400–450 million. (*Id.* at ¶ 9).

36. Construction on the various contract packages will overlap and there will be workers on the site performing work on the various contract packages at the same time. (*Id.*)

## CONCLUSIONS OF LAW

### A. Plaintiff BCTD's Standing

1. Article III standing "focuses on the party seeking to get his complaint before a federal court and not on the issues he wishes to have adjudicated." *Flast v. Cohen*, 392 U.S. 83, 99, 88 S.Ct.

1942, 20 L.Ed.2d 947 (1968). To establish standing under Article III, the party in question must prove: (1) an injury-in-fact that is concrete and particularized, and actual or imminent; (2) a fairly traceable causal connection between the injury alleged and the conduct in dispute; and (3) a sufficient likelihood that the relief sought will redress the injury. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992); *Friends of the Earth, Inc. v. Laidlaw Environmental Services, Inc.*, 528 U.S. 167, 180, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000).

2. An association has standing on behalf of its members when: (1) its members would otherwise have standing to sue in their own right; (2) the interests the association seeks to pursue are germane to its purpose; and (3) neither the claim asserted nor the relief requested require the participation of individual members of the organization. *Friends of the Earth*, 528 U.S. at 181, 120 S.Ct. 693; *Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 343, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977).

3. A court need not determine the standing of a party when the standing of others has been established. *See e.g., U.S. Airwaves, Inc. v. F.C.C.*, 232 F.3d 227, 232–33 (D.C.Cir.2000); *Military Toxics Project v. E.P.A.*, 146 F.3d 948, 954 (D.C.Cir.1998); *Railway Labor Executives' Ass'n v. United States*, 987 F.2d 806, 810 (D.C.Cir.1993).

4. Where the plaintiff challenging a regulatory action is "an object of the action (or foregone action) at issue ... there is little question" that the plaintiff has been injured as a result of the Government regulation. *Lujan*, 504 U.S. at 562, 112 S.Ct. 2130. Where the plaintiff is not an object, but is rather an incidental victim of an independent third party, whose action is

left largely "unfettered" by the challenged regulatory action, the plaintiff faces a "substantially more difficult" burden of adducing facts to show its injury was caused by the Government regulation. *Id.*

5. A party can be "an object" of Government regulation even when the regulation requires nominally "independent" third parties to implement the regulation's prohibitions, when the injury is produced by determinative or coercive effect upon the action of the third party. *Bennett v. Spear,* 520 U.S. 154, 169, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997); *Telephone and Data Systems Inc. v. F.C.C.,* 19 F.3d 42, 47 (D.C.Cir.1994) ("we need not attempt any broad explanation of the justiciability of indirect injury, for one narrow proposition is clear: injurious private conduct is fairly traceable to the administrative action contested in the suit if that action authorized the conduct or established its legality"); *National Wildlife Federation v. Hodel,* 839 F.2d 694, 705 (D.C.Cir.1988) ("mere indirectness of causation is no barrier to standing, and thus, an injury worked on one party through a third party intermediary may suffice").

6. The Executive Order's prohibitions are imposed on Plaintiff BCTD and its councils through the mandated action of federal agencies. Thus, with respect to the Wilson Bridge, for example, although Plaintiff BCTD's harm may technically flow from the fact that the State of Maryland did not and, absent an injunction, cannot include a PLA bid specification in its advertisements for construction contracts, Maryland's actions are certainly the result of the enforcement of the Executive Order. Thus, Plaintiff BCTD is an object of the Executive Order.

7. Plaintiff BCTD has a legally protected interest in both negotiating and enforcing a PLA, and thus, Plaintiff BCTD has suffered an injury-in-fact necessary for standing. In addition, Plaintiff BCTD's injury is ongoing, and thus, Plaintiff BCTD has suffered the requisite injury for forward-looking injunctive relief. *Natural Law Party v. FEC,* 111 F.Supp.2d 33, 43 (D.D.C.2000). In addition, Plaintiff BCTD has demonstrated that it has a history of negotiating PLAs on projects financed, at least in part, with federal financial assistance. Therefore, Plaintiff BCTD has shown that "injury sometime in the reasonably foreseeable future seems fairly probable." *International Union of Bricklayers v. Meese,* 761 F.2d 798, 803 (D.C.Cir.1985); *Adarand Constructors, Inc. v. Pena,* 515 U.S. 200, 212, 115 S.Ct. 2097, 132 L.Ed.2d 158 (1995).

8. Plaintiff BCTD's injury-in-fact is fairly traceable to the actions of the defendants, as defendant Norman Y. Mineta's agency, acting through FHWA, nullified the PLA Plaintiff BCTD negotiated on the Wilson Bridge project. Furthermore, further injury to Plaintiff BCTD is redressable through the injunctive and declaratory relief sought in this case. Accordingly, Plaintiff BCTD has established that it has standing in its own right.

9. The Executive Order has also harmed, and continues to harm, Plaintiff BCTD's local building and construction trades councils. One of the goals of Plaintiff BCTD and its affiliated councils is to exercise their rights to negotiate enforceable PLAs to govern labor relations on construction projects, and to do so on as many projects as they are able under market conditions. (Second Sullivan Dec., Ex. 4 to Pls. Mot. at ¶ 7). The equitable relief requested in this case does not require the participation of those local councils. Accordingly, Plaintiff BCTD has demonstrated that it also has associational standing. *See e.g., United Food and Commercial Workers Local 751 v. Brown Group,* 517

U.S. 544, 552–53, 116 S.Ct. 1529, 134 L.Ed.2d 758 (1996).

## B. Plaintiff BCTD is Entitled to a Preliminary Injunction

■ 10. "A court considering a plaintiff's request for a preliminary injunction must examine whether: (1) there is a substantial likelihood the plaintiff will succeed on the merits; (2) plaintiff will be irreparably injured if an injunction is not granted; (3) an injunction will substantially injure the other party; and (4) the public interest will be furthered by the injunction." *Serono Laboratories, Inc. v. Shalala*, 158 F.3d 1313, 1317–18 (D.C.Cir.1998); *Washington Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 843 (D.C.Cir. 1977). No one factor is determinative. Rather, "[t]hese factors interrelate on a sliding scale and must be balanced against each other." *Serono Laboratories*, 158 F.3d at 1318. "A stay may be granted with either a high probability of success and some injury, or *vice versa*." *Cuomo v. United States Nuclear Regulatory Comm'n*, 772 F.2d 972, 974 (D.C.Cir.1985).

11. The usual role of a preliminary injunction is to preserve the status quo pending the outcome of litigation. The term "status quo" refers to "the last uncontested status which preceded the pending controversy." *District 50, United Mine Workers v. United Mine Workers*, 412 F.2d 165, 168 (D.C.Cir.1969); *cf. Consarc Corp. v. U.S. Treasury Dep't*, 71 F.3d 909, 913 (D.C.Cir.1995) (status quo means the last uncontested status); *See also Praefke Auto Elec. & Battery Co. v. Tecumseh Products Co.*, 123 F.Supp.2d 470 (E.D.Wis.2000) ("the courts define 'status quo' as the last peaceable, uncontested status of the parties which preceded the actions giving rise to the issue in controversy"). The last uncontested status preceding the present controversy is the time prior to February 17, 2001, when the President signed the Executive Order.

12. In *Chamber of Commerce v. Reich*, 74 F.3d 1322 (D.C.Cir.1996), the D.C. Circuit held that the President may not use his procurement powers to create a new set of labor relations rules, different from those established by Congress and preserved through the National Labor Relations Act.

13. The D.C. Circuit in *Reich* drew on the body of NLRA preemption cases "that mark out the boundaries of the field occupied by the NLRA," to conclude that "[n]o state or federal official or government entity can alter the delicate balance of bargaining and economic power that the NLRA establishes." 74 F.3d at 1333–34, 1337. The court thus made plain that NLRA preemption principles, which initially applied to state laws establishing general rules of conduct, apply with equal force to Presidential Executive Orders that "similarly ... encroach into the NLRA's regulatory territory" by imposing standards of conduct as a condition of doing business with the government.

14. The Supreme Court has articulated two distinct NLRA pre-emption principles. *Building and Const. Trades Council of the Metro. Dist. v. Associated Builders and Contractors of Mass./Rhode Island, Inc.*, 507 U.S. 218, 224, 113 S.Ct. 1190, 122 L.Ed.2d 565 (1993) ("*Boston Harbor*").

15. The first, "*Garmon* pre-emption," forbids regulation of activities that are arguably protected or arguably prohibited by the NLRA. *San Diego Building Trades Council v. Garmon*, 359 U.S. 236, 244, 79 S.Ct. 773, 3 L.Ed.2d 775 (1959); *Boston Harbor*, 507 U.S. at 224–25, 113 S.Ct. 1190; *Reich*, 74 F.3d at 1334.

16. The second, "*Machinists* pre-emption," prohibits regulation of areas that have been left to be controlled by the free

play of economic forces. *Machinists v. Wisconsin Employment Relations Commission,* 427 U.S. 132, 140, 96 S.Ct. 2548, 49 L.Ed.2d 396 (1976); *Boston Harbor,* 507 U.S. at 225, 113 S.Ct. 1190; *Reich,* 74 F.3d at 1334. This line of pre-emption holds that government regulation may not interfere with "Congress' intentional balance between the uncontrolled power of management and labor to further their respective interests" within the collective bargaining process. *Boston Harbor,* 507 U.S. at 226, 113 S.Ct. 1190; *Reich,* 74 F.3d at 1334.

17. A PLA is a form of a prehire collective bargaining agreement. A prehire agreement is an agreement negotiated before the start of a construction project, usually before employees are hired. Section 8(f) of the National Labor Relations Act ("NLRA"), 29 U.S.C. § 158(f), authorizes the use of prehire agreements in the construction industry.

18. Section 8(e) of the NLRA, 29 U.S.C. § 158(e), authorizes prehire agreements to require all contractors and subcontractors performing work on a particular construction project to be bound by the terms of a prehire agreement covering the project.

19. Taken together, §§ 8(e) and (f) of the NLRA authorize the use of a PLA on a construction project, pursuant to which all contractors and subcontractors operating on the project must agree to adhere to the PLA's terms.

20. In enacting §§ 8(e) and (f), Congress undeniably established the parameters within which construction employers and unions could bargain, influenced only by their own economic power, and the "free play of economic forces." The Executive Order undeniably intrudes into that field, by skewing those economic forces. Just as the Executive Order at issue in *Reich* interfered with the free play of eco-

nomic forces by removing a legitimate bargaining weapon from the employers' arsenal, this Executive Order also interferes with those economic forces by placing the unions on notice that, in attempting to negotiate a PLA, they will be bargaining against the weight of the Government's promised financial assistance. Accordingly, the Executive Order conflicts with the NLRA under the principles of *Machinists* pre-emption.

■ 21. The Executive Order also conflicts with the NLRA under the principles of *Machinists* pre-emption for another reason. In *Boston Harbor,* the Court explained that, "[t]o the extent that a private purchaser may choose a contractor based upon that contractor's willingness to enter into a prehire agreement, a public entity as purchaser should be permitted to do the same." 507 U.S. at 231, 113 S.Ct. 1190. And, the Court recognized that, "there was some force to [the] argument ... that denying an option to public owner-developers that is available to private owner-developers itself places a restriction on Congress' intended free play of economic forces identified in *Machinists.*" By conditioning the award of federal financial assistance on the City of Richmond's relinquishment of its right to enter into a PLA, the Executive Order interferes with an area Congress sought to leave controlled by the free play of economic forces.

22. The Executive Order also conflicts with the NLRA under principles of *Garmon* pre-emption. Section 8(e) expressly preserves to unions and construction employers the right, through their prehire agreements, to limit contracting and subcontracting on a construction site to those firms that agree to adhere to the collective bargaining agreement. *Woelke & Romero Framing, Inc. v. NLRB,* 456 U.S. 645, 652–54, 102 S.Ct. 2071, 72 L.Ed.2d 398

(1982). Yet, the Executive Order prohibits project owners and construction managers from requiring, through their "bid specifications, *project agreements*, or other controlling documents," that any contractor or subcontractor on the project "or on other related construction project(s)" adhere to a collective bargaining agreement. 66 Fed. Reg. 11225 (emphasis added). Thus, by its literal terms, the Executive Order strips from construction owners and managers, and from unions seeking to bargain with those entities, the right to negotiate the kind of agreement expressly protected by § 8(e), *i.e.*, an agreement requiring all the contractors and subcontractors on the site to abide by a master collective bargaining agreement. *See Reich*, 74 F.3d at 1335 (describing the PLA on the Boston Harbor project as "a 'pre-hire' agreement in the construction industry [that] is a legal option under § 8(f) of the NLRA as an exception to the general prohibition under § 8(e) against 'hot cargo' agreements.").

23. The Executive Order conflicts with the NLRA under the principles of *Garmon* pre-emption for an additional reason. *Garmon* preemption bars any governmental regulation that conflicts with the "complex and interrelated federal scheme of law, remedy and administration." *Reich*, 74 F.3d at 1334. The Executive Order conflicts with the "federal [labor law] scheme" by essentially disqualifying from federal assistance any entity that seeks to exercise its right to use a PLA on its construction project. Thus, for example, when the State of Maryland was awaiting FHWA approval of the Wilson Bridge PLA, FHWA warned it that if it proceeded without the necessary approval, it would lose its federal funding. Thus, like the Government's attempt in *Reich* to debar contractors that hired striker replacements, this Executive Order disqualifies from participation in federal programs any entity that utilizes certain provisions cov-

ered by the NLRA. In each case, the governmental actions have impermissibly interfered with Congress' "complex scheme" of collective bargaining, by penalizing employers and unions that engage in activities "protected or prohibited" by the NLRA.

24. Because the Executive Order unquestionably conflicts with the NLRA, the plaintiff BCTD has shown that it is likely to succeed on the merits of this case.

■ 25. Although FHWA approval is still necessary for Plaintiff BCTD to be able to enforce its PLA on the Wilson Bridge project, Plaintiff BCTD is entitled to a preliminary injunction to return to the status quo that existed before the Executive Order was put in place: Plaintiff BCTD had negotiated an agreement, binding on Maryland, and Maryland was using its "best efforts" to implement it. Enjoining the Executive Order would permit Maryland to revive those efforts, and the State has represented that, if given the opportunity, that is what it will do. There is no question that the State does not control the process and thus is unable to provide complete assurance that it will succeed in including the PLA in the bid specification. Absent an injunction, however, Plaintiff BCTD can be assured of irreparable harm.

26. The harm to the defendants from an Order preliminarily enjoining the enforcement of the Executive Order is minimal. A preliminary injunction would merely preserve the plaintiffs' NLRA rights pending the outcome of this case. Prior to the implementation of the Executive Order, owners and construction managers on federal and federally-assisted construction projects had long had the authority to negotiate PLAs with construction unions.

27. An injunction would further the public interest because, absent an injunction, the State of Maryland is prohibited from proceeding with its portion of the Wilson Bridge construction in the manner it has determined will best serve the interest of its citizens. Moreover, the public interest favors enjoining an Executive Order that violates the Constitution or federal statutes. *O'Donnell Constr. Co. v. District of Columbia,* 963 F.2d 420, 429 (D.C.Cir.1992) (holding that "issuance of a preliminary injunction [against a constitutionally suspect affirmative action plan] would serve the public interest in maintaining a system of laws free of unconstitutional racial classifications"); *Washington v. Reno,* 35 F.3d 1093 (6th Cir.1994) (stating that there is a "public interest in having agencies abide by the federal laws that govern their existence and operations").

28. Plaintiff BCTD did not significantly delay filing this action. In fact, it filed 19 days after the President amended the Executive Order. *See Moltan Co. v. Eagle–Picher Ind.,* 55 F.3d 1171, 1176 (6th Cir. 1995) (delay not held against plaintiffs where they were seeking other avenues to resolve dispute). Moreover, "mere delay, without any explanation on [the defendant's] part of why such delay negatively affected them, [does] not lessen [the plaintiff's] claim of irreparable injury." *Ty, Inc. v. The Jones Group,* 237 F.3d 891, 903 (7th Cir.2001); *see also, Kansas Health Care Ass'n v. Kansas Dept. of Social Services,* 31 F.3d 1536, 1544 (10th Cir.1994); *Culliford v. CBS, Inc.,* 1984 WL 787, 1984 U.S. Dist. LEXIS 20204 (D.C.D.C.1984).

29. Plaintiff BCTD is entitled to a preliminary injunction prohibiting the defendants from enforcing the Executive Order against the Wilson Bridge PLA negotiated between plaintiff BCTD and Parsons Constructors. *See National Treasury Employees Union v. Yeutter,* 918 F.2d 968,

976 (D.C.Cir.1990) (narrowly drawn injunction appropriate where portions of challenged government program remained lawful).